UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LARRY J. LEBLANC,

    Plaintiff

v.

KINDRED NURSING CENTERS EAST, LLC
d/b/a EMBASSY HOUSE,

    Defendant

Civil Action No. 04-CV-10193 RCL

**DEFENDANT'S STATEMENT OF UNDISPUTED**
**MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1**

Pursuant to U.S. District Court Local Rule 56.1, Defendant Kindred Nursing Centers East, LLC ("Kindred" or the "Company") submits this Statement of Undisputed Material Facts in support of its motion for Summary Judgment. The pleadings of record, the deposition testimony of the parties and the relevant documentary exhibits (all of which are attached to the accompanying Declaration of David J. Kerman, Esq.), and the Declaration of Dee A. Every filed herewith, establish the following undisputed material facts:

A.     **General Background**

1.     Defendant Kindred is a health care corporation that operates Embassy House Skilled Nursing and Rehabilitation Center (the "Center"), a nursing home located in Brockton, Massachusetts. (Compl. ¶¶2, 4.) Kindred employed Plaintiff as the Administrator at the Center from June 26, 2002 until his discharge in August 2003. (Compl. ¶¶4, 6; Pl. Tr. I, p. 73.)[1] As Administrator of the Center, Plaintiff was responsible for overseeing the day-to-day operations

---

[1] References to Plaintiff's deposition testimony will be made by citing the volume and page number of the transcript, i.e., "Pl. Tr. I, p. ___," or "Pl. Tr. II, p. ___." References to the deposition testimony of other witnesses will cite the individual's last name and page number of the transcript, i.e., "Reis, p. ___."

of the nursing home and ensuring that the facility complied with the law and with Kindred's policies and procedures (Pl. Tr. I, p. 74). Plaintiff was paid an annual salary of $80,000.00. (Pl. Tr. I, p. 47.)

2.  Plaintiff was interviewed and hired for his Administrator position by Mr. Gilbert Reis. (Pl. Tr. I, p. 46.) Mr. Reis was employed by Kindred as District Director of Operations, and he was responsible for supervising 12 nursing homes located south of Boston, including the Center. (Reis, p. 11.) The Administrators at these 12 nursing homes, including Plaintiff, reported directly to Mr. Reis. (Id.) Mr. Reis was employed by Kindred as District Director of Operations for 17 years (1986-2003). (Id.) At all material times, Mr. Reis reported to Kindred's Senior Vice President for the Northeast Region, Ms. Donna Kelsey. (Kelsey, pp. 6-7.)

### B.   Plaintiff's Performance Problems As Administrator

3.  Plaintiff exhibited a number of job performance problems during his first four months of employment with Kindred. As a result, Mr. Reis issued Plaintiff a written disciplinary notice on November 1, 2002. (Pl. Tr. II, pp. 85-86; Pl. Dep. Ex. 16.) The disciplinary notice cited Plaintiff's deficiencies in a number of areas, including (a) making misrepresentations about resident care, safety issues and staff attitude; (b) failing to support the Center's dementia unit; (c) failing to provide leadership and consistent support to the Center's staff, resulting in poor morale; and (d) being absent from the Center for long periods of time during the workday without informing the staff of his departure or whereabouts. (Id.) The disciplinary notice further stated that Plaintiff faced termination from employment if he failed to improve his performance. (Id.)

4.  Plaintiff's performance as Administrator was also deficient with respect to other management responsibilities, such as reviewing the Center's outstanding accounts receivables on

a consistent basis in order to improve collections, and conducting monthly staff meetings with his direct reports to address quality assurance issues. (Reis, pp. 65-68, 77-79.)

5.  During 2003, the financial performance of Plaintiff's nursing home was deteriorating. (Reis, p. 24-25.) Mr. Reis had discussions with Ms. Kelsey on a monthly basis about the operations of the Center. (Kelsey, p. 17.) Plaintiff was not properly controlling labor costs and the Center's resident census (i.e., occupancy rate) was declining. (Id., p. 18.) While the majority of Kindred's nursing homes in the region had a resident census of 94-95%, the census at the Center was only about 80%. (Id. p. 20.) The revenues being generated by Plaintiff's nursing home were lower than forecasted and the Center's expenses were higher than forecasted. (Govoni, p. 10.)

### C.  Events Leading Up To Plaintiff's Warning In June 2003

6.  Because of the problematic performance of Plaintiff's nursing home, Mr. Reis and Ms. Kelsey decided to devote additional managerial resources to assist Plaintiff. Accordingly, Mr. Jeffrey Govoni, an Area Administrator at Kindred, was selected to provide guidance and direction to Plaintiff, and to oversee Plaintiff's management of the facility. (Kelsey, pp. 19, 31; Govoni, p. 9). Mr. Govoni began working with Plaintiff in May 2003. (Govoni, p. 9.)

7.  After reviewing the Center's operations, Mr. Govoni informed Plaintiff that he should conduct weekly marketing meetings with his key staff to discuss strategies to increase the resident census. (Govoni, pp. 12-15.) Plaintiff initially responded to Mr. Govoni by stating that he did not intend to conduct marketing meetings because he did not feel they would be useful. (Id. p. 17.) After Mr. Govoni consulted Mr. Reis about Plaintiff's response, he informed Plaintiff that he was required to conduct the marketing meetings. (Id. p. 18.) While Plaintiff then informed Mr. Govoni that he would conduct the meetings, Plaintiff was subsequently asked

by Mr. Govoni to provide written documentation that such marketing meetings had occurred, and Plaintiff was unable to do so. (Id. pp. 18-20.)

8.   On several occasions, Plaintiff expressed doubt to Mr. Govoni about whether he (Plaintiff) was the appropriate person to hold the position of Administrator. (Id. pp. 24-25.)

9.   Based on Plaintiff's continuing performance problems, Mr. Reis and Mr. Govoni decided to issue Plaintiff a written warning in June 2003. (Govoni, p. 20; Plaintiff's Dep. Ex. 18.) The warning, dated June 16, 2003, reiterated that Plaintiff was required to hold weekly marketing meetings, and Plaintiff was also directed to send the minutes of those meetings to Mr. Govoni and Mr. Reis. (Id.)

### D.   Plaintiff's Refusal To Conduct A Wage Survey

10.   In reviewing the operations of Plaintiff's nursing home, Ms. Kelsey was troubled by the fact that the Center's expenditures for outside contract labor, (i.e., temporary help obtained from staffing agencies) were increasing during the course of 2003. (Kelsey, pp. 28-30.) Plaintiff claimed that he had to rely extensively upon contract labor because the wage rates paid by the Center were allegedly too low to attract and retain regular (permanent) employees. (Id. 33.) In order to evaluate Plaintiff's position and determine whether the Center should raise its wage rates, Mr. Reis and Mr. Govoni directed Plaintiff to conduct a wage survey to ascertain the wages being paid by area nursing homes that competed with the Center. (Reis, p. 117.) Specifically, on June 3, 2003, Plaintiff was asked to complete a wage survey in his area and to submit the results to Mr. Reis in two weeks. (Govoni, pp. 26-27; Pl. Dep. Ex. 22.)

11.   Mr. Govoni had several conversations with Plaintiff in which he emphasized to Plaintiff that he needed to conduct a wage survey. (Govoni, pp. 27-29.) Despite these directives, Plaintiff objected to doing a wage survey and claimed that a survey would be useless. (Id.) Plaintiff asserted that he was opposed to doing a wage survey in the summer of 2003 because he

4

had done a wage survey eight months earlier, and Mr. Reis had not adjusted the wages in the manner that Plaintiff had desired. (Id.) Mr. Govoni explained to Plaintiff that it was necessary to conduct wage surveys on a regular basis because salaries in the market are constantly changing, and because substantial time had elapsed since the Center's last survey, a new survey was needed in order to consider wage increases for Plaintiff's employees. (Id. 29-30.)

### E.   Plaintiff's Refusal To Cooperate In The Auditing Of Resident Charts

12.   One manner in which a nursing home can potentially increase revenue is to accurately document all clinical services provided to its Medicaid residents so that it can be properly reimbursed by the Medicaid program. Medicaid reimbursement payments for services are partially determined by the results of a Management Minutes Questionnaire ("MMQ"), which measures how many nursing care minutes a Medicaid resident needs; the MMQ results are validated by examining the documentation regarding the clinical services provided to the resident. (Kelsey, pp. 25-26.) If the services provided to residents are not properly documented, a facility's MMQ results for residents may be lower than they should be, and the facility may not receive the proper Medicaid reimbursement. (Id.) In fact, the Medicaid reimbursement payments being received by the Center were quite low, given the level of services provided to its residents (Reis. pp. 93-94).

13.   In order to evaluate and potentially improve the MMQ resident scores in Plaintiff's facility, Mr. Reis and Mr. Govoni directed Plaintiff to contact a local Kindred administrator in order to borrow that nursing home's experienced MMQ nurse to independently audit resident charts at the Center. (Govoni, pp. 30-32.) This step was necessary because the Center did not have an experienced MMQ nurse on staff. (Id.) While Plaintiff initially agreed to contact the other Kindred facility and borrow its MMQ nurse, he subsequently refused to do so.

5

(Id. 32-33.) Plaintiff testified that he refused to comply with the clear instructions of his supervisors because the Center's director of nurses (who reported to Plaintiff) allegedly disliked the idea. (Pl. Tr. II, 146-147.) However, as Administrator, Plaintiff was in charge of all personnel at the Center, and he had the authority to bring in the MMQ nurse to audit the resident charts, and he could also require his staff to cooperate with the nurse. (Govoni, pp. 41-43.)

### F.   Plaintiff's Warning In July 2003 And His Subsequent Termination From Employment

14.   On July 15, 2003, Mr. Govoni issued Plaintiff an additional written warning. (Pl. Tr. II, pp. 153-154; Pl. Dep. Ex. 22.) The warning stated that while Plaintiff had been directed on June 3, 2003 to complete a wage survey and forward it to the District Director of Operations within two weeks, he had not completed the task as of July 15, 2003. (Id.) The warning further documented that during the week of June 9, 2003, Plaintiff had been directed to contact another facility's MMQ nurse to obtain assistance in auditing resident charts. (Id.) As of July 15, 2003, Plaintiff had not complied with this directive either. (Id.) The written warning also noted that Plaintiff had not attended a scheduled Administrator's meeting on June 17, 2003, and he had failed to notify Mr. Reis or Mr. Govoni that he would be absent. (Id.) The warning established a deadline of July 29, 2003 for Plaintiff to submit a wage survey to Mr. Reis, and it further provided that Plaintiff had to make a request for MMQ chart audit assistance by July 30, 2003. (Id.) The July 15, 2000 warning issued to Plaintiff was designated as a Final Written Warning. (Id.)

15.   At his deposition, Plaintiff admitted that he did not perform the wage survey by July 29, 2003, and he also readily conceded that he did not request MMQ chart audit assistance by the prescribed deadline of July 30, 2003. (Pl. Tr. II, pp. 163-64.) Plaintiff makes no contention that he was prevented from meeting these deadlines by any events or circumstances.

Indeed, as of August 22, 2003 -- three weeks beyond the final deadlines -- Plaintiff had still not done the wage survey or made a request for chart audit assistance. (Id. pp. 180-81.) As a result of Plaintiff's continued refusal to comply with management directives, Mr. Reis and Mr. Govoni met with Plaintiff on August 22, 2003 and terminated his employment. (Id. pp. 178-79.)

### G. Plaintiff's Internal Concerns When He Was Employed By Defendant

16. At his deposition, Plaintiff testified that during his Kindred employment, he expressed a number of work-related concerns, and he also disagreed with certain decisions made by his supervisor, Mr. Reis.

17. For instance, immediately after Plaintiff began his employment in the summer of 2002, Mr. Reis informed Plaintiff that the facility's prior Administrator had failed to obtain a number of criminal record background checks for employees, and Mr. Reis directed Plaintiff to remedy the problem (Pl. Tr. I, pp. 86-87). Plaintiff testified that his attempt to use Kindred's outside vendor to perform the background checks was delayed for "a couple of days," because Mr. Reis first wanted to see if the documents relating to the background checks could be located somewhere within the facility. (Id. pp. 90-92.) However, Plaintiff acknowledged that Mr. Reis allowed him to bring in the outside vendor to do the criminal background checks, and Plaintiff further conceded that Mr. Reis did not prevent or interfere with Plaintiff's efforts to fix the problem. (Pl. Tr. I, p. 92; Pl. Tr. II, p. 117.)

18. Because the Center received funds from Medicare and Medicaid, the facility was required to submit annual Cost Reports to both the federal and state governments. (Declaration of Dee A. Every, ¶¶ 1-2).[2] The Cost Report for each Kindred nursing home facility is prepared and submitted by Kindred's Corporate Reimbursement Department in Kentucky. (Every Dec.

---

[2] References to the Declaration of Dee A. Every will be made as "Every Dec. ¶___."

¶2). The Reimbursement Department has procedures and safeguards in place that are designed to ensure the accuracy of the financial information and expenses reported by each facility and incorporated into the facility's Cost Reports. (Id. ¶4). For instance, each nursing home Administrator is required to sign and submit to the Company's Reimbursement Department, a written statement verifying the accuracy of the financial information maintained by the facility and utilized in preparing the Cost Report. (Id.) After the Reimbursement Department finalizes a facility's Cost Report, Kindred's Vice President of Reimbursement signs and certifies the Cost Report, and the Report is then submitted to the appropriate government agency. (Id.; Every Dec. Exs. A and B).

19.  In August 2002 and again in February 2003, Plaintiff declined to sign the cost report verification statements in the format prepared by Kindred's Reimbursement Department. (Pl. Tr. I, pp. 104-106, 115-117; Pl. Dep. Exs. 2 and 3.). Plaintiff declined to sign the verification statement, even though he had been informed by the facility's Business Office Manager that Administrators normally sign the form. (Pl. Tr. I, p. 95.). Instead, Plaintiff deleted the text of Kindred's verification statement and created his own handwritten statement regarding the limited information he was willing to verify. (Pl. Dep. Exs. 2 and 3.). When Plaintiff discussed with Mr. Reis his reluctance to sign the August 2002 verification form, Mr. Reis told him to sign it. (Pl. Tr. 1, 100-101.) Plaintiff had no further conversation with Mr. Reis about the matter. (Id. pp. 113-14.).

20.  In March and April 2003, employees in Kindred's Reimbursement Department in Kentucky had communications with Plaintiff regarding the need for him to properly sign the verification statement for the Center's financial information. (Every Dec. ¶¶ 6-8; Dec. Exs. D and E). The Reimbursement Department explained to Plaintiff that the Departmental form that

8

he was refusing to sign was not requesting him to verify the accuracy of the Cost Report itself, but rather was seeking verification that the underlying financial information maintained in the facility's general ledger was accurate. (Id.) Ultimately, Plaintiff finally submitted the appropriate signed verification statement to the Reimbursement Department, but only after he was informed that the Center would forfeit substantial Medicaid payments if the Center's Cost Report was not submitted in a timely fashion. (Every Dec. ¶8; Ex. F.)

21. At his deposition, Plaintiff testified that he had no evidence that the Cost Reports for his facility contained any false or fraudulent information, and he never made any such allegation to Company officials. (Pl. Tr. I, pp. 97, 126; Every Dec. ¶9.) Further, Plaintiff testified that he was confident that the Center's financial information was accurate; indeed the Center's general ledger was maintained by an employee directly supervised by Plaintiff. (Pl. Tr. II, pp. 15-17.)

22. Plaintiff also testified about his concerns regarding the Center's decision to take three beds out of circulation so that an empty room could be put to more effective use. According to Plaintiff, Mr. Reis had determined that the Center did not have sufficient space to use for the residents' rehabilitation needs. (Pl. Tr. I, p. 155) Because the Center's resident census was well below capacity, Mr. Reis decided to temporarily remove three beds from an empty room and use the space to better accommodate the rehabilitation services offered to residents. (Id.) Mr. Reis testified that based upon his long-term managerial experience with Kindred, he did not believe that state approval was necessary when a nursing home temporarily removed empty beds to better utilize space. (Reis, pp. 38-40). Plaintiff testified that he was fine with the concept of removing the beds to improve rehabilitation services, but he told Mr. Reis that State approval was necessary. (Pl. Tr. I, p. 155). Mr. Reis declined to seek state approval;

rather, he directed Plaintiff to remove the beds, and Plaintiff complied with the request by taking out the three beds in January or February 2003. (Id. pp. 154-56.) Subsequently, a State official conducting a survey of the facility in April 2003, informed Plaintiff that the Center had been deficient in not obtaining prior approval for the removal of the beds, and thereafter, the facility placed the three beds back into circulation. (Id. pp. 158-161.)

23. Plaintiff testified that the staff at the Center parked their cars in a parking lot that was actually owned by an adjacent restaurant. (Pl. Tr. I, p. 177.) The nursing home had had an arrangement with the restaurant for over 20 years concerning the Center's use of the parking lot. (Reis, pp. 53-54.) In July 2003, Mr. Reis asked Plaintiff to re-pave and improve the parking lot. (Pl. Tr. I, p. 177.) When Plaintiff responded to Mr. Reis by suggesting that the facility should seek the permission of the restaurant before doing the work, Mr. Reis allegedly replied, "just do it." (Id.) Plaintiff never took any action with respect to re-paving the parking lot, and Mr. Reis never spoke to Plaintiff again about the matter. (Id. pp. 179-80.)

24. Plaintiff also testified that he recommended that the Center obtain state or corporate approval to convert an activities office to rehabilitation space, and that Mr. Reis declined to accede to Plaintiff's request. (Pl. Tr. I, pp. 185-186.) Plaintiff acknowledged however, that he did not know whether State approval was actually required for this decision. (Pl. Tr. II, pp. 208-09.)

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | KINDRED NURSING CENTERS EAST, LLC, d/b/a EMBASSY HOUSE SKILLED NURSING AND REHABILITATION CENTER<br>By its attorneys, |
|  | /s/Richard W. Paterniti<br>David J. Kerman, BBO#269370<br>Richard W. Paterniti, BBO#645170<br>Jackson Lewis LLP<br>75 Park Plaza<br>Boston, MA 02116 |
| November 30, 2004 | (617) 367-0025 |

### CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2004, a copy of the foregoing was delivered by first class mail to Plaintiff's counsel, Paul A. Manoff, 47 Winter Street, 4th Floor, Boston, MA 02108.

*/s/ Richard W. Paterniti*
Jackson Lewis LLP