UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LARRY J. LEBLANC,

      Plaintiff

v.

KINDRED NURSING CENTERS EAST, LLC
d/b/a EMBASSY HOUSE,

      Defendant

Civil Action No. 04-CV-10193 RCL

## **DECLARATION OF DAVID J. KERMAN**

David J. Kerman, on oath, deposes and says as follows:

1.     I am a partner with the firm Jackson Lewis LLP, counsel for Defendant in the above-captioned matter. I have been involved in the defense of this litigation on behalf of Kindred Nursing Centers East, LLC d/b/a Embassy House ("Kindred").

2.     I took the first day of the deposition of Plaintiff Larry Leblanc on or about March 31, 2004. True and accurate photocopies of excerpts from that deposition transcript are attached as Exhibit A.

3.     I took the second day of Plaintiff's deposition on or about June 16, 2004. True and accurate photocopies of excerpts from that deposition transcript are attached as Exhibit B.

4.     Attached hereto as Exhibit C is a true and accurate copy of a cost report verification statement from August 2002. This document was shown to and identified by Larry Leblanc at his deposition and was marked as Exhibit 2.

5.     Attached hereto as Exhibit D is a true and accurate copy of a cost report verification statement from February 2003. This document was shown to and identified by Larry Leblanc at his deposition and was marked as Exhibit 3.

6.      Attached hereto as Exhibit E is a true and accurate copy of a memorandum from Gilbert Reis to Plaintiff dated November 1, 2002. This document was shown to and identified by Larry Leblanc at his deposition and was marked as Exhibit 16.

7.      Attached hereto as Exhibit F is a true and accurate copy of document entitled "Performance Improvement Form," which is dated June 16, 2003. This document was shown to and identified by Larry Leblanc at his deposition and was marked as Exhibit 18.

8.      Attached hereto as Exhibit G is a true and accurate copy of document entitled "Performance Improvement Form," which is dated July 15, 2003. This document was shown to and identified by Larry Leblanc at his deposition and was marked as Exhibit 22.

9.      Attached hereto as Exhibit H is a true and accurate copy of document entitled "Performance Improvement Form," which is dated August 18, 2003. This document was marked at Larry Leblanc's deposition as Exhibit 24.

10.     On or about August 5, 2004, Plaintiff's counsel took the deposition of Gilbert Reis. True and accurate photocopies of excerpts of his deposition are attached as Exhibit I.

11.     On or about September 10, 2004, Plaintiff's counsel took the deposition of Jeffrey Govoni. True and accurate photocopies of excerpts of his deposition are attached as Exhibit J.

12.     On or about September 10, 2004, Plaintiff's counsel took the deposition of Donna

Kelsey.  True and accurate photocopies of excerpts of her deposition are attached as Exhibit K.

Signed under the pains and penalties of perjury this 30th day of November, 2004.

David J. Kerman

## CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2004, a copy of the foregoing was delivered by first class mail to Plaintiff's counsel, Paul A. Manoff, 47 Winter Street, 4th Floor, Boston, MA 02108.

Jackson Lewis LLP

# EXHIBIT A

1

Volume I
Pages 1 - 201
Exhibits 1 to 4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - x
                             :
LARRY J. LEBLANC,             :
           Plaintiff,        :
                             :
        vs.                  : Civil Action No.
                             : 04-CV-10193RCL
KINDRED NURSING CENTERS EAST,  :
LLC, d/b/a EMBASSY HOUSE,      :
           Defendant.        :
                             :
- - - - - - - - - - - - - - - - x

        DEPOSITION OF LARRY J. LeBLANC, a witness
called on behalf of the Defendant, taken pursuant to
the Federal Rules of Civil Procedure, before Daniel
P. Wolfe, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Jackson Lewis LLP,
75 Park Plaza, Boston, Massachusetts, on Wednesday,
March 31, 2004, commencing at 10:15 a.m.

PRESENT:

    Law Office of Paul A. Manoff
        (by Paul A. Manoff, Esq.)
        47 Winter Street, 4th Floor, Boston, MA
        02108, for the Plaintiff.

    Jackson Lewis LLP
        (by David J. Kerman, Esq.)
        75 Park Plaza, Boston, MA 02116,
        for the Defendant.

                 * * * *

1    A.    From another administrator.

2    Q.    Who was that?

3    A.    His name was John Corless.

4    Q.    Did he work for Kindred?

5    A.    He did.

6    Q.    What facility did he work at?

7    A.    Colony House.

8    Q.    Where was that?

9    A.    Abington, Mass.

10    Q.    Who interviewed you for the job at Kindred?

11    A.    Gilbert Reis.

12    Q.    Do you recall when the interview was in

13    terms of the month?

14    A.    June.

15    Q.    So June of 2002?

16    A.    Correct.

17    Q.    Did anyone besides Gilbert Reis interview

18    you for the job?

19    A.    No.

20    Q.    So he made you an offer?  Who made you the

21    offer?

22    A.    He did.

23    Q.    Do you recall what the salary you were

24    offered to start at Kindred?

1      A.    $80,000.

2      Q.    Was that at Embassy House?

3      A.    Correct.

4      Q.    Did you know anything about Embassy House

5   before you interviewed for the job at Kindred?

6      A.    No.

7      Q.    I am going to --

8      A.    Just that it was a tough building.

9      Q.    How had you heard that it was a tough

10  building?

11     A.    I read it in the newspapers.  It had its

12  reputation in the community.

13     Q.    When you say "a tough building," what was

14  your understanding as to what made it a tough

15  building?

16     A.    It was mismanaged.

17     Q.    By the way, when you worked at Avery Manor,

18  did you ever receive any warnings of disciplinary

19  action for any reason?

20     A.    No.

21     Q.    When you worked for Rehabilitation

22  Associates, did you ever receive any warnings of

23  disciplinary action?

24     A.    No.

1    units.

2        Q.    So it is a combination of assisted living

3    and nursing home?

4        A.    Correct.

5        Q.    Do you know what the position would pay?

6        A.    No.

7        Q.    Have you had any other job interviews in

8    the past month?

9        A.    No.

10       Q.    Do you have any job interviews currently

11   scheduled that haven't taken place but they are

12   scheduled to take place?

13       A.    No.

14       Q.    When did you actually start working at

15   Embassy House?  Do you recall the date?

16       A.    It was Monday, June 26.

17       Q.    2002?

18       A.    Correct.

19       Q.    Did you receive any salary increases during

20   your employment with Kindred?

21       A.    No.  But I did receive a bonus.

22       Q.    How much was the bonus, if you recall?

23       A.    $6,000.

24       Q.    When did you receive the bonus?

1    A.    March of 2003.

2    Q.    Do you know what the formula was that

3    resulted in you getting this $6,000 bonus?  Can you

4    describe it to me?

5    A.    The only thing that I knew was that in the

6    district that I was in, which included I think 13

7    nursing homes, Kindred weighed their bonuses based

8    on district performance.  And from what I was told

9    was that because Embassy House had performed well,

10   that it got Reis's district into the top ten which

11   made us eligible for bonuses.

12   Q.    Was there a range of bonuses that you could

13   have received, in other words, a low end or a

14   maximum bonus that you could have received?

15   A.    I don't know how they calculated it.

16   Q.    When you worked at Kindred, at Embassy

17   House, could you describe for me in your own words

18   what your duties and responsibilities were.

19   A.    Yes.  My duties were to maintain full

20   compliance with the law and conduct the day-to-day

21   operations and to follow Kindred policy and

22   procedure.

23   Q.    Were you given any orientation or training

24   when you came aboard as administrator at Embassy

1    actually observe her performance as program

2    director, did you think she was an inappropriate

3    candidate to be selected for that job?

4        A.    No.

5        Q.    Focusing on your first six months of

6    employment at Kindred, are there any other

7    disagreements or disputes that you had with Mr.

8    Reis?

9        A.    Yes.

10        Q.    Please describe any others.

11        A.    My first few weeks on the job, it was

12    discovered that 50 out of 130 employees had legally

13    been CORIed.  The remaining balance had no CORIs.

14        Q.    How was that found out?

15        A.    When Mr. Reis met with me that first day,

16    he basically took the book and threw it at me and

17    said, "This is a mess.  Fix it."

18        Q.    I'm sorry.  When you say "the book," what

19    book?

20        A.    CORI book.

21        Q.    You mean the facility had a separate book

22    of CORI checks that it conducted on employees?

23        A.    Yes.

24        Q.    So continue.  Only 50 out of 130 employees

1   had been legally CORIed; is that what you are

2   saying?

3       A.   Right.  They were breaking the law by

4   bringing new employees in without the proper

5   criminal background investigation screenings.

6       Q.   Before you got there, who had been

7   responsible for conducting the screenings?

8       A.   Lisa Akins.

9       Q.   How do you know that?

10      A.   I was told.

11      Q.   Continue.  Did this lead to some

12  disagreement between you and Mr. Reis?

13      A.   It left a -- no, he didn't disagree.  He

14  admitted that they had failed.  "Fix it."

15      Q.   Did you take steps to fix it?

16      A.   Yes.  I got it in full compliance.

17      Q.   Did he voice any disapproval or

18  disagreement of your efforts to fix the problem?

19      A.   When I called the company in that does the

20  CORI screenings, he seemed reluctant.  He didn't

21  want to know any more.

22      Q.   When you say you called the company in,

23  what company are you referring to?

24      A.   It is called -- NCPS, I think it's called,

1    extra money?

2         A.    I don't think that was a question.

3         Q.    What do you mean?  You had it in the

4    budget?

5         A.    I think NCPS which was hired by Kindred,

6    they had a -- they were hands off.  If somebody had

7    to be screened, you could do it.

8         Q.    Did Mr. Reis in any way undermine your

9    efforts to try to fix this problem?

10        A.    He interfered.

11        Q.    In what way did he interfere?

12        A.    He delayed me getting Mr. D'Orio in from

13   NCPS to come in to do an assessment.

14        Q.    In what way did he delay you from

15   getting --

16        A.    Because he didn't believe that it was so

17   out of control.

18        Q.    But I am asking you what did he do that you

19   believe constituted delaying you from getting this

20   done?

21        A.    He had me research further fruitlessly --

22        Q.    I'm sorry.  What?

23        A.    -- fruitlessly to see if the documents

24   might have been somewhere else in the building.  It

1   just became a game after that.

2       Q.   Why do you say it just became a game?

3       A.   He was trying to cover it up, in my

4   opinion.

5       Q.   But he told you to fix it, correct?

6       A.   Right.

7       Q.   How do you reconcile him telling you to fix

8   it with your statement that he was trying to cover

9   it up?

10          MR. MANOFF:  Objection.

11      Q.   You can answer.

12      A.   Could you ask the question again.

13      Q.   Well, how do you reconcile in your own mind

14  him telling you to fix it with the statement you

15  made that he was trying to cover it up?

16          MR. MANOFF:  Objection.

17      A.   He said he'd call Steve D'Orio himself.

18      Q.   Did he?

19      A.   I don't know.

20      Q.   Didn't Steve D'Orio come in to assist you?

21      A.   Right.

22      Q.   Was that as a result of him calling or you

23  calling?

24      A.   Me.

1      Q.    So you were allowed to call Mr. D'Orio,

2    correct?

3      A.    Right.

4      Q.    You said you were delayed by Mr. Reis,

5    though.  How long were you delayed in terms of when

6    you first wanted to call Mr. Delayed until you

7    actually did call him?

8      A.    Maybe a couple of days.

9      Q.    So it was only a couple of days transpired

10   in which he was allegedly delaying this effort?

11     A.    Right.

12     Q.    And that's because he wanted to see if the

13   documents could be found somewhere else in the

14   building?

15     A.    Correct.

16     Q.    Once Mr. D'Orio came in, did Mr. Reis

17   interfere at all with your efforts to --

18     A.    No.

19     Q.    Let me finish the question.  Once Mr.

20   D'Orio came in, did Mr. Reis interfere with your

21   efforts to bring things into compliance?

22     A.    No.

23     Q.    Did you have, again focusing on this

24   six-month period that we have been talking about,

1       Q.   Is it done on an annual basis?

2       A.   Correct.

3       Q.   So there was one due in August of 2002; is

4   that what you are saying?

5       A.   Right.

6       Q.   Do you know what time period that covered?

7       A.   Well, I'm not sure.  I think it covered

8   fiscal 2002, from July 1 -- let's see -- July 1,

9   2002, to June 30, 2003.

10      Q.   Well, if you were asked, though, to sign it

11  in August of 2002, would it be July 1, 2001, through

12  June 30, 2002?

13      A.   No, I don't think so.  I think they were

14  looking for the prior fiscal year.  I started

15  working June 26.  So I think it went from --

16      Q.   June 26, 2002?

17      A.   2002.  So I think it went from July 1,

18  2001, to June 30, 2002.

19      Q.   I think that's what I was trying to say.

20  Okay.  At some point were you told that you were

21  expected to sign this cost report verification?

22      A.   My business office manager told me that

23  administrators normally signed them.

24      Q.   So that would be Heidi Mason told you that?

1    Q.    You don't know whether the information in

2  the cost report was accurate or inaccurate?

3    A.    Correct.

4    Q.    You don't have any reason to believe that

5  the information in the cost report was false or

6  fraudulent, do you?

7         MR. MANOFF:  Objection.

8    Q.    You can answer.

9    A.    Not at that time.  It was too early.  I had

10 just started working.

11    Q.    I am asking, though, for the cost report

12 that you had concerns about signing off and

13 verifying, did you have any reason to believe that

14 the information that Kindred had prepared and put in

15 that cost report was inaccurate or false or

16 fraudulent?

17         MR. MANOFF:  Objection.  Which cost report

18 are you referring to?

19         MR. KERMAN:  The one he was asked to sign

20 in August 2002.

21    A.    There was no way of me telling because I

22 wasn't the administrator.

23    Q.    I understand.  So you had no knowledge one

24 way or the other, is what you are saying?

1    meeting told us, all the administrators, never to

2    sign a cost report verification unless the cost

3    report has been viewed, and if you have any

4    questions, you have an accountant view it and get

5    the appropriate information.

6        Q.    So was this a seminar, then, for Athena

7    employees?

8        A.    Correct.  But then I met Martha again at

9    the National American Healthcare Association

10   conference we had here in Boston.  We had attended a

11   program together about what was going on.  This was

12   post-September 11.

13       Q.    Okay.  But the time that you heard Martha

14   Meng -- so she didn't work for Athena, she was an

15   outside attorney?

16       A.    Correct.

17       Q.    But she had said to a group of

18   administrators at a seminar that Athena conducted

19   that you should not sign a cost report verification

20   unless you have personally reviewed the report?

21       A.    And had an expert look at it if need be, if

22   there was anything you had any question about.

23       Q.    So when you called Mr. Reis, you told him

24   about what you had heard from Martha Meng about not

1    signing these reports?

2        A.    Yes.

3        Q.    You told him that?

4        A.    Yes.   I didn't tell him specifically Martha

5    Meng, but I told him that a prominent attorney had

6    advised us.  And I was telling him for his own

7    information as well.

8        Q.    What did he say in response?

9        A.    He said "Sign it."

10       Q.    Did he say anything else?

11       A.    No.  And he said it in a way that was

12   threatening.  But I told him that I would refuse to

13   sign it and I made a comment on the cost report

14   itself.  After I had done that I got a call from the

15   regional business office person, business office

16   manager.  Her name was Betsy Parmental.

17       Q.    You referred to her as a regional business

18   office manager?

19       A.    Yes.

20       Q.    Her name was Betsy -- could you spell her

21   last name for the record.

22       A.    Parmental, P-a-r-m-e-n-t-a-l.

23       Q.    Before we get to that conversation, you

24   said Mr. Reis said "Sign it."  Those were his words?

104

1      A.    Correct.

2      Q.    "Cost Report Verification.  Cost Report

3   Year: 7/1/01 to 6/30/02."  Is this the verification

4   that we have been talking about, Mr. LeBlanc?

5      A.    Yes.

6      Q.    I see this handwriting that says next to

7   "Cost Report Verification" -- does that say "LJL

8   start date: 6/26/02"?

9      A.    Yes.

10     Q.    Is that your handwriting?

11     A.    Yes.

12     Q.    Did you put that on at the time you signed

13  that, or did you put that handwritten notation on

14  subsequently?

15     A.    I'm not sure.

16     Q.    Then there is a paragraph under "Cost

17  Report Year" that says, "I understand that any

18  misrepresentation or false or misleading statement."

19  Do you see that paragraph that begins with that

20  language?

21     A.    Yes.

22     Q.    I see a line through that.  Is that a line

23  that you put through that paragraph?

24     A.    Yes.

1    Q.    Underneath that it says "Print

2   Administrator Name" and it says "Larry LeBlanc,"

3   correct?

4    A.    Yes.

5    Q.    And "Signature of Administrator," that's

6   your signature --

7    A.    Correct.

8    Q.    -- next to the date 8/22/02?

9    A.    Correct.

10    Q.    Is that your handwriting underneath that?

11    A.    Yes.

12    Q.    Could you, so the record is clear, just

13   read the statement that you wrote there.

14    A.    "Please note that this signature attests to

15   information provided on Medicare Questionnaire

16   completed by Business Office Manager only.  It does

17   not attest to statements made on Medicare/Medicaid

18   cost reports."

19    Q.    You referred to Medicare/Medicaid cost

20   reports.  But this verification simply refers to

21   Medicare, correct?

22    A.    No.  It says "made on Medicare or Medicaid

23   cost reports," if you continue reading the fine

24   print.

1    Q.   Okay.  Did you write this notation down on
2    the same date that you signed it, 8/22/02?
3    A.   Yes.
4    Q.   Did you write this notation down and sign
5    it after you had spoken to Mr. Reis and expressed
6    your concern to Mr. Reis?
7    A.   Yes.
8    Q.   And he said "Sign it."  How soon after he
9    said "Sign it" did you sign it?
10   A.   The way it is presented?
11   Q.   Yes.
12   A.   Right away.
13   Q.   The same day?
14   A.   I don't recall.
15   Q.   But pretty soon after the conversation?
16   A.   Right.  I didn't want to delay.  I didn't
17   want to put the facility in any harm in any way that
18   they'd be delayed payments.  I was more concerned
19   about making sure that it was done right.
20   Q.   At some point -- okay.  So you signed this.
21   You put this notation on this.  Then did you send
22   this document to somebody?
23   A.   I gave it back to the business office
24   manager and she sent it down to Louisville.

113

1    Q.    So that was before you spoke to Betsy
2    Parmental you had spoken to Heidi about it,
3    correct?
4    A.    Right.  Before I -- right.
5    Q.    Before you spoke to Betsy Parmental, you
6    had spoken to Gilbert Reis about it, correct?
7    A.    Correct.
8    Q.    After speaking to Betsy Parmental, did you
9    speak to Gilbert Reis again about this issue?
10   A.    I e-mailed him when another cost report
11   came up, and I don't recall the date.
12   Q.    Let's just focus on this cost report that
13   is dated August 22, 2002.  Did you ever speak to
14   Gilbert Reis about that document again, Exhibit 2?
15   A.    No, not that I recall.
16   Q.    Did he ever bring it up to you again, this
17   August 22, 2002, verification?  No?
18   A.    Not that I recall.
19   Q.    Did anyone else at Kindred -- putting aside
20   Mr. Reis and Ms. Parmental and Heidi Mason, has
21   anyone else at Kindred that we haven't spoken about
22   ever talked to you about Exhibit 2 and your
23   verification comments?
24   A.    Yes.

1      Q.    Who else at Kindred?

2      A.    It was at the corporate level and it was

3   after December 30 of 2002.

4      Q.    Do you remember who you spoke to?

5      A.    I think her name was Rhonda Gentry.

6      Q.    Did she initiate the conversation with you

7   or did you initiate the conversation with her?

8      A.    She initiated with me.

9      Q.    She called you about your verification on

10  Exhibit 2?

11     A.    Correct.  I don't know if it was about this

12  one here.  It might have been about another cost

13  report verification that came along.

14     Q.    Afterwards?

15     A.    Afterwards.

16     Q.    Focusing for now, at least, on Exhibit 2,

17  do you recall speaking to anyone else about Exhibit

18  2 besides the individuals you have already disclosed

19  to me?

20     A.    No.

21     Q.    But you do recall another issue coming up

22  with the cost report and your signature -- you do

23  recall another cost report coming up, an issue that

24  you had signing another cost report?

1    A.    Yes.

2    Q.    Do you remember offhand when that issue

3    arose?

4    A.    No.

5         MR. KERMAN:  Let me have this marked as

6    Exhibit 3, if I could.

7              (Document marked as LeBlanc

8              Exhibit 3 for identification)

9    Q.    Have you seen Exhibit 3?  Take your time to

10   read it.

11   A.    Yes, I've seen it.

12   Q.    This says at the top "Exhibit 3 Facility

13   Medicaid Questionnaire for the Purpose of Filing the

14   Medicaid Cost Report, Period 1/1/02 to 12/31/02."

15   It appears in the middle part of this document to

16   have -- it says "Print Name of Preparer."  That says

17   "Heidi Mason."  And she was a business office

18   manager; is that correct?

19   A.    Yes.

20   Q.    You referred to having an issue with

21   another cost report.  Is this the other cost report

22   you were referring to?

23   A.    Yes.  There was two other cost reports.

24   There was this one and then the one in August.

116

1       Q.    August of what year?

2       A.    2003.

3       Q.    On this one here, do you see about sort of

4   the bottom third of the page there is a heading that

5   says "Cost Report Verification" and it looks like

6   there is a line through it, and it says "Facility

7   Medicaid Questionnaire"?

8       A.    Right.

9       Q.    Is that your writing on that --

10      A.    Yes.

11      Q.    -- the cross-out?  Why did you cross out

12  that "Cost Report Verification" and write "Facility

13  Medicaid Questionnaire"?

14      A.    Because in my discussion with Rhonda

15  Gentry, she told me that's what I was answering.

16      Q.    Then there is again a four-line paragraph,

17  it looks like.  The left-hand side is cut off, but

18  it looks like it says, "Understand that any

19  misrepresentation or false and misleading

20  statement."  Do you see that paragraph?

21      A.    Yes.

22      Q.    There are some lines through those four

23  typewritten lines.  Is that your handwritten

24  cross-outs there?

1      A.    Yes.

2      Q.    Then could you read what it says underneath

3    that where it says "Signature."

4      A.    "Signature of the administrator in no way

5    verifies the accuracy of cost report.  It does

6    verify information on enclosed" -- I don't know what

7    the rest of it says -- that was being submitted by

8    the business office manager.

9      Q.    So along with this Exhibit 3 verification

10   page, was there information on a questionnaire

11   submitted by the business office manager, to your

12   recollection?

13     A.    Yes.

14     Q.    And you did review that and you felt that

15   that was accurate?

16     A.    Correct.

17     Q.    But did you ever see the cost report

18   itself?

19     A.    No.

20     Q.    To your knowledge, that was prepared by

21   Corporate?

22     A.    Correct.

23     Q.    Was that submitted by Corporate directly to

24   Medicaid?

1    you said you saw the Medicaid questionnaire that

2    Heidi Mason had prepared that went along with

3    Exhibit 3; is that correct?

4         A.    Correct.

5         Q.    And that was accurate?

6         A.    Correct.

7         Q.    And you never saw the actual Medicaid cost

8    report for the period of January 1, 2002, to

9    December 31, 2002, correct?

10        A.    Correct.

11        Q.    Do you have any information or reason to

12   believe that there was any false or fraudulent

13   information that Kindred put in that Medicaid cost

14   report?

15        A.    There was no way I could tell without

16   seeing the cost report.

17        Q.    So you don't know one way or the other

18   whether it is accurate or inaccurate, correct?

19        A.    Correct.

20        Q.    Let me show you what has been marked as

21   Exhibit 4 which is, I will represent, a set of

22   documents that we received from your attorney.  The

23   first page says "Plaintiff's Rule 26(a)(1)

24   Disclosures."  And after that there are a series of

1    Q.    Is it based at all on the census as opposed

2  to the number of beds?

3    A.    No.  It is based on the number of beds.

4    Q.    Does patient census have anything to do

5  with reimbursement?

6    A.    It does.  The calculation is based on the

7  number of licensed beds.  In other words, if I took

8  three beds out of circulation, my cost would have

9  been based on 120 beds, not 123.

10    Q.    But the number of beds -- that's, I take

11  it, one of many factors that goes into

12  reimbursement, correct?

13    A.    It is.

14    Q.    There are additional factors as well.

15    A.    Right.

16    Q.    Let me ask you, when were these three beds

17  taken out of circulation?

18    A.    Beginning of 2003.  I don't remember the

19  exact date.

20    Q.    Does that mean January of 2003?

21    A.    I don't remember the exact date.

22    Q.    Approximately.  I am trying to get an

23  approximate time period.

24    A.    They were taken out maybe between January

155

1    and February.

2        Q.    Tell me the circumstances that led to these

3    beds being taken out of circulation.

4        A.    Gilbert Reis had made a determination that

5    there was not enough rehab space in the building.

6    And due to the fact that our census averaged around

7    109 110, he thought maybe we could take three beds

8    out of circulation in a room to better accommodate

9    the rehab department.  And I told him, "That's fine,

10   Gilbert, but we need to get approval from the

11   state."  And his answer was expletive.

12       Q.    I'm sorry.  What did he say?

13       A.    It was an expletive answer.

14       Q.    Tell me what he said.

15       A.    He said, "Fuck the state."

16       Q.    Was this a conversation that you had in

17   conversation with Mr. Reis?

18       A.    Yes.

19       Q.    Was anyone else present for this

20   conversation?

21       A.    Not that I recall, although they may have

22   been.

23       Q.    Do you remember specifically?

24       A.    I am trying to help you.  I don't remember,

156

1    I don't recall.  We did go through one time with the

2    district director of rehab, and I'm not sure if she

3    was -- I don't believe she was present.  I don't

4    think Gilbert would have spoken like that in front

5    of a lady, anyway.

6        Q.    Who was the district director of rehab?

7        A.    Her name was Jarrel.

8        Q.    Is that a first name or last name?

9        A.    First name.  I forget her last name.

10       Q.    Could you spell Jarrel.

11       A.    J-a-r-r-e-l.

12       Q.    So after you said you needed to get

13   approval from the state he said, "Fuck the state"?

14       A.    Yes.

15       Q.    Did you have any further conversation with

16   him?

17       A.    Yes.  He said, "Just take the beds out."

18   He said, "I've done it in all my other buildings."

19   In other words, he was making his own rules.

20       Q.    So he said, "Just take the beds out"?

21       A.    Right.

22       Q.    What did you say?

23       A.    I kind of disagreed with him.  I said, "We

24   need to get permission."  And then time went by and

158

1    Q.    Do you remember anything else, any other

2    things that were said in the conversations between

3    you and Mr. Reis about this issue of removing the

4    beds, any other statements that he made to you or

5    you made to him?

6    A.    I did tell him that it would have an effect

7    on the reimbursement methodology.  He said he didn't

8    care.

9    Q.    Do you remember anything else that was said

10    between you and him?

11    A.    No.

12    Q.    Weren't the beds eventually put back?

13    A.    We had a state survey.  The state came in.

14    Q.    When was that?

15    A.    April 9.

16    Q.    April 9, 2003?

17    A.    Correct.

18    Q.    Tell me what happened with regard to the

19    beds in connection with the state survey.

20    A.    What had happened was I had gone -- I had

21    to have hernia surgery.  Actually, the hernia

22    surgery I think was scheduled for April 9, the day

23    that they arrived.  I think it was a Thursday.  I

24    was told that I needed two weeks to recover, but I

1    was told that I needed to be back on the job

2    regardless.  So that following Monday I went back to

3    work, and the first thing the surveyors said to me

4    was that they did a count and there was only 120

5    beds.

6        Q.    This is what the state surveyor said to

7    you?

8        A.    Right.  They told me that we needed to get

9    approval to take the beds out of circulation and

10   asked me why I didn't.

11       Q.    I'm sorry.  Asked you why you didn't get

12   approval?

13       A.    Right.

14       Q.    What did you say?

15       A.    I said that the director of operations told

16   me I didn't need approval.

17       Q.    By that, you were referring to Mr. Reis?

18       A.    Correct.

19       Q.    So what else happened?  Do you remember any

20   further conversation with the state?

21       A.    Regarding that matter?

22       Q.    Yes, that matter.

23       A.    Just that I'd make sure that we are in

24   compliance, that I would not put the facility's

160

1   license at risk, because this was a licensure issue,

2   it wasn't a certification issue, and I would

3   immediately comply and put the beds back.  But Reis

4   continued to resist.

5       Q.   After the state surveyors mentioned that

6   there were only 120 beds to 123, you told Mr. Reis

7   about --

8       A.   He was there.  He had to cover for two days

9   him and another administrator because I had hernia

10  surgery.

11      Q.   When were you out for your hernia surgery?

12      A.   I was out on the 9th, the day they arrived.

13      Q.   What day was that?

14      A.   I'm quite sure it was a Thursday.

15      Q.   When did you return to work?

16      A.   The following Monday.

17      Q.   So Mr. Reis was present when the state

18  survey person mentioned that there were only 120

19  beds as opposed to 123?

20      A.   I'm quite sure he was.

21      Q.   When were the beds put back?

22      A.   Within the weeks after.  A few weeks after.

23      Q.   So by the end of April, they were back?

24      A.   Yes.  It says it right on the letter to the

1   state when we'd be in compliance again.

2       Q.   I don't know if I have that letter here.

3       A.   I know it was no more than 30 days.  They

4   don't give you more than 30 days to do it.

5       Q.   So the beds were put back in the time limit

6   established by the state for compliance?

7       A.   Correct.  And we cleared it.

8       Q.   What do you mean "We cleared it"?

9       A.   In other words it was not longer -- they

10  give you deficiencies and they give you a certain

11  time to correct them, and then they say they are

12  cleared.

13      Q.   So they found that you were back in

14  compliance, correct?

15      A.   Correct.

16      Q.   When the state surveyors noticed that you

17  were three beds short, didn't Mr. Reis agree to put

18  the beds back?

19      A.   I don't know.  He didn't with me.  He

20  continued to say that he had a right to take the

21  beds out of circulation.

22      Q.   You are not saying that he defied the state

23  after they told you you had to correct that

24  deficiency, are you?

1    that requirement of replacing the chairs?

2         A.    Yes, when they came back to re-survey.

3         Q.    So that was accomplished, then, correct?

4         A.    I did it.

5         Q.    You didn't pay for it personally, correct?

6         A.    No.

7         Q.    But that requirement was satisfied,

8    correct?

9         A.    Sure.

10        Q.    In what way did Mr. Reis interfere with the

11   center's operations outside of the survey process?

12   What did he do that you consider interference?

13        A.    He took me outside one day, and across from

14   Embassy House there is a parking lot that our staff

15   parks in, and the parking lot belongs to Christo's,

16   which is a restaurant next door.  And he told me

17   that I needed to make improvements on Christo's

18   property without getting their permission.

19        Q.    What did he specifically say to you?

20        A.    He said, "I want the driveway tarred.  I

21   want a new surface put on the driveway.  I want

22   lines.  Start getting quotes for all this."  And I

23   said to him -- and Mr. Govoni was present.  I said

24   to him, "Gilbert, don't you think we should get

179

1      Q.    Did Mr. Govoni say anything?

2      A.    He shook his head in disbelief.

3      Q.    So he didn't support Mr. Reis, then, on

4   that?

5      A.    No.

6            MR. MANOFF:  Objection.

7      Q.    He was in disbelief with what Mr. Reis was

8   saying, is your recollection?

9            MR. MANOFF:  You are asking what he said,

10  or his opinion?

11     Q.    When you are saying he shook his head in

12  disbelief, you interpret he was in disbelief of what

13  Mr. Reis was saying?

14     A.    What he was asking of us, yes.

15     Q.    This was in July.  Can you tell me when in

16  July, approximately?

17     A.    It was right before I went on vacation.

18     Q.    When did you go on vacation?

19     A.    I went on vacation the last week in July

20  and the first week in August.

21     Q.    I take it you never contacted Christo's or

22  anything afterward?

23     A.    No.

24     Q.    Do you know if anyone else contacted

1  that requirement of replacing the chairs?

2      A.    Yes, when they came back to re-survey.

3      Q.    So that was accomplished, then, correct?

4      A.    I did it.

5      Q.    You didn't pay for it personally, correct?

6      A.    No.

7      Q.    But that requirement was satisfied,

8  correct?

9      A.    Sure.

10     Q.    In what way did Mr. Reis interfere with the

11  center's operations outside of the survey process?

12  What did he do that you consider interference?

13     A.    He took me outside one day, and across from

14  Embassy House there is a parking lot that our staff

15  parks in, and the parking lot belongs to Christo's,

16  which is a restaurant next door.  And he told me

17  that I needed to make improvements on Christo's

18  property without getting their permission.

19     Q.    What did he specifically say to you?

20     A.    He said, "I want the driveway tarred.  I

21  want a new surface put on the driveway.  I want

22  lines.  Start getting quotes for all this."  And I

23  said to him -- and Mr. Govoni was present.  I said

24  to him, "Gilbert, don't you think we should get

178

1    permission from Christo's?"

2          "Ah, forget Christo's.  Just do it."

3       Q.   What did you say when he said, "Just do

4    it"?

5       A.   There was nothing more I could say.

6       Q.   You didn't go ahead and do it, did you?

7       A.   No.

8       Q.   So you didn't comply with that order,

9    correct?

10      A.   No.  But I would have -- if I was to

11   comply, I would have first contacted Corporate to

12   get their permission and then I would have contacted

13   Christo's to ask them if it's okay if we make that

14   type of improvement to their property.  He said, "No

15   way.  Just do it."  Then after I kind of refused,

16   that's when the two of them started really harassing

17   me.

18      Q.   When did this occur where you were outside

19   and he made this comment about repaving the lot?

20      A.   July of 2003.

21      Q.   And Mr. Govoni was there?

22      A.   Yes.

23      Q.   When in July 2003 was it?

24      A.   I don't remember the exact date.

1    Christo's?

2        A.    No.

3        Q.    And the improvement was never done,

4    correct?

5        A.    I don't know.

6        Q.    While you were there, it was never done --

7        A.    No.

8        Q.    -- correct?  Did Mr. Reis ever say anything

9    to you besides that one conversation about doing

10   anything in the parking lot?

11       A.    It never came up again because I came back

12   from vacation the second week in July -- August.

13   I'm sorry.

14       Q.    How long were you on vacation?

15       A.    Two weeks.

16       Q.    When did you go on vacation?

17       A.    Last week in July, first week in August.

18       Q.    But when you came back from vacation until

19   you were terminated, it never came up again?

20       A.    No.

21       Q.    Are there any other situations you can tell

22   me where Mr. Reis interfered with the center's

23   operations outside of the survey process?

24       A.    Nothing more than what I have already told

185

1  existing we needed to get approval for.

2      Q.   Do you know what the expense of this --

3  cost to change the office into the rehab room, how

4  much money was spent?

5      A.   I don't know off the top of my head.

6      Q.   When was this done, that they changed the

7  office into a rehab room?

8      A.   That project was initiated immediately

9  after we cleared with the state.

10     Q.   Was that sometime in May or June of 2003?

11     A.   I'd say June of 2003.

12     Q.   Did you speak to either Reis or Mr. Govoni

13  and say, "You'd better get state approval for this"?

14     A.   Yes.

15     Q.   Who did you speak to?

16     A.   Both.

17     Q.   In a single conversation or separately?

18     A.   In a single.

19     Q.   So was it the three of you together?

20     A.   Yes.

21     Q.   Tell me what you said and tell me any

22  response that they made.

23     A.   I told them based on the experience that we

24  had just had taking the three beds out of

186

1    circulation, that if we are going to take rehab

2    space -- again, rehab space is something that

3    reflects a cost report, because the square footage

4    is used to calculate your rates.  So you need to get

5    approval because what you are doing is you are

6    adding square footage to rehab.  We went through all

7    this.  My response to them was "I believe we should

8    get approval or at least corporate approval."

9        Q.    Do you know whether either one of them

10    spoke to anyone in corporate?

11        A.    I don't know that.

12        Q.    For instance, you don't know what the

13    specific threshold is in terms of dollar amount or

14    extent of renovation that triggers the requirement

15    for state approval, do you?

16        A.    The regulation states specifically that if

17    you take any beds out of service -- this is a state

18    regulation.

19        Q.    Right.  Now we are not talking about that.

20    We are talking about changing an office to a rehab

21    room.

22        A.    Right.

23        Q.    That's what we are talking about now.  I am

24    asking if you know personally what the threshold is

1  COMMONWEALTH OF MASSACHUSETTS)

2  SUFFOLK, SS.                )

3     I, Daniel P. Wolfe, Registered Professional

4  Reporter and Notary Public in and for the

5  Commonwealth of Massachusetts, do hereby certify

6  that there came before me on the 31st day of March,

7  2004, at 10:15 a.m., the person hereinbefore named,

8  who was by me duly sworn to testify to the truth and

9  nothing but the truth of his knowledge touching and

10  concerning the matters in controversy in this cause;

11  that he was thereupon examined upon his oath, and

12  his examination reduced to typewriting under my

13  direction; and that the deposition is a true record

14  of the testimony given by the witness.

15     I further certify that I am neither attorney or

16  counsel for, nor related to or employed by, any

17  attorney or counsel employed by the parties hereto

18  or financially interested in the action.

19     In witness whereof, I have hereunto set my hand

20  and affixed my notarial seal this _6th_ day of April,

21  2004.

22     _____

23                              Notary Public

24              My commission expires  9/18/09

**DORIS O. WONG ASSOCIATES, INC.**
(617) 426-2432 ~ Fax (617) 482-7813

# EXHIBIT B

2-1

Volume II
Pages 2-1 to 2-236
Exhibits 5 to 32

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                :
LARRY J. LeBLANC,               :
          Plaintiff,            :
                                :
     vs.                        :   C.A. No.
                                :   04-CV-10193RCL
KINDRED NURSING CENTERS EAST,   :
LLC, d/b/a EMBASSY HOUSE,       :
          Defendant.            :
                                :
- - - - - - - - - - - - - - - -x

        CONTINUED DEPOSITION OF LARRY J. LeBLANC, a
witness called on behalf of the Defendant, taken
pursuant to the Federal Rules of Civil Procedure,
before Ken A. DiFraia, Registered Professional
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Offices of
Jackson Lewis LLP, 75 Park Plaza, Boston,
Massachusetts, on Wednesday, June 16, 2004,
commencing at 10:33 a.m.

PRESENT:

    Paul A. Manoff, Esq.
        47 Winter Street,
        Boston, MA 02108, for the Plaintiff.

    Jackson Lewis LLP
        (by David J. Kerman, Esq.)
        75 Park Plaza, Boston, MA 02116,
        for the Defendant.


                    *  *  *  *  *

2-15

1     A.    On the computer, as far as I knew, they

2   did.

3     Q.    Is that something that Heidi Mason

4   maintained on the computer?

5     A.    Yes.

6     Q.    Can you tell me to the best of your

7   knowledge what information that she maintained on

8   the computer that constituted this general ledger?

9     A.    I don't remember.

10     Q.    Well, in a general sense, do you know what

11   she was supposed to be putting in the general

12   ledger?

13     A.    I think it was accounts receivables.

14     Q.    Was there anything else that she was

15   reporting in the general ledger?

16     A.    Not that I can recall.

17     Q.    Do you know whether expenses and costs were

18   maintained by her on the computer?

19     A.    As far as I knew, they were.

20     Q.    As far as you knew, they were?

21     A.    Yes.

22     Q.    Would there be a hard copy printed out from

23   time to time of accounts receivable or expenses and

24   costs that she was keeping on the computer?

2-16

1      A.    No.

2      Q.    Do you know what kinds of expenses and

3    costs were kept on the computer?

4      A.    Accounts payables, accounts receivables.

5      Q.    Were there other expenses and costs that

6    she kept?

7      A.    Not that I know of.

8      Q.    Did you have access to this computer to

9    check on the information that she was keeping if you

10   chose to look at it?

11     A.    No.

12     Q.    You didn't have access?

13     A.    No.

14     Q.    Did you ever try to get access to that

15   information?

16     A.    No.

17     Q.    You trusted her to be doing it accurately?

18     A.    Yes.

19     Q.    To your knowledge, was this information

20   that she was keeping on the computer also something

21   that was sent to the corporate people at Kindred?

22     A.    Yes.

23     Q.    So they had access to the information that

24   she was keeping on the computer, correct?

2-17

1    A.    Yes.

2    Q.    You don't have any information or reason to

3    believe that any of the information that Heidi Mason

4    was keeping on the computer was inaccurate or

5    fraudulent or false, do you?

6    A.    No.

7    Q.    As administrator, did you have any

8    responsibility to ensure that the information that

9    Heidi Mason was keeping on the computer was

10   accurate?

11   A.    No.

12   Q.    You trusted her essentially?

13   A.    Yes.

14   Q.    Based on your experience with her, were you

15   confident that she was keeping accurate information

16   on the computer with regard to expenses, accounts

17   receivable and accounts payable?

18   A.    Yes.

19                 (Document marked as LeBlanc

20                 Exhibit 9 for identification)

21   Q.    I'm showing you what was marked as Exhibit

22   No. 9.  I'll also represent, if you want to see,

23   Mr. LeBlanc, that Exhibit 9 is also a copy of a

24   document that you previously produced to us in your

2-85

1      A.    It's a memo.

2      Q.    Do you remember receiving this memo from

3   Mr. Reis?

4      A.    Yes.

5      Q.    Did you have a meeting or conversation with

6   Mr. Reis to go over the items that were in this

7   memo?

8      A.    I had a meeting with him, but he didn't go

9   over the items.

10     Q.    Did he ever discuss with you any of the

11  items that were in this memo dated November 1, 2002,

12  whether it was in a specific meeting or conversation

13  with you at any time?

14     A.    I don't remember.

15     Q.    Item 1 says, "Misrepresentation to Gilbert

16  about resident care and safety issues (such as

17  showers not given)."

18          Did you ever have any conversation with

19  Mr. Reis about the issue of showers not been given

20  to residents?

21     A.    Yes.

22     Q.    Could you tell me what you recall from your

23  conversation with Mr. Reis about that.

24     A.    I told Gilbert that the plumbing in the

2-86

1    building was in dire distress and that when the

2    nurses gave showers, the shower room drains would

3    regurgitate sewage back into the showers.  It was a

4    problem for the CNA's to do their jobs.

5        Q.    Did you tell Mr. Reis that residents were

6    not being given showers as a result of this?

7        A.    Yes.

8        Q.    Did he ever say to you that he didn't

9    believe you or that he had contrary information?

10       A.    I don't recall.

11       Q.    Do you remember him ever getting back to

12   you about this issue of whether the residents were

13   getting showers or not?

14       A.    I don't remember.

15       Q.    Item 2 says, "Not supportive of mission,

16   dementia unit, i.e., delay with program director's

17   appointment and the unit's environment readiness."

18            Do you recall having any conversation with

19   Mr. Reis about this subject in No. 2?

20       A.    Yes.

21       Q.    Tell me what you remember about your

22   conversation with him.

23       A.    That he had already had in his mind who he

24   was appointing as program director.

2-117

1    corporation?

2            MR. MANOFF:  Objection.

3        A.    I'm not sure.

4        Q.    Other than the controversy about whether

5    you should register with the state or use the

6    private agency, Mr. Reis did not prevent you from

7    fixing this CORI problem?

8        A.    That's correct.

9        Q.    You mentioned you had some infection

10   control problems the facility was dealing with?

11       A.    Yes.

12       Q.    Could you tell me what those infection

13   control problems were that you were dealing with.

14       A.    A lot of it had to do with the plumbing in

15   the building, toilets overflowing, sewerage in

16   between the walls.  A lot of the bathrooms were not

17   functional and in some cases hazardous.

18            The director of housekeeping had resigned.

19   The building was filthy.  It was like a cesspool.

20   Along with, you know, the plumbing problems and the

21   lack of housekeeping when I started, there were huge

22   issues.

23       Q.    Did you hire a new director of

24   housekeeping?

2-146

1    affects reimbursement, were relatively low?

2        A.    I don't recall that as being a reason.

3        Q.    Are you denying that that was the reason,

4    or you just don't remember?

5            MR. MANOFF:   Objection.

6        A.    I don't remember.

7        Q.    Do the MMQ's, though, affect a facility's

8    reimbursement?

9        A.    Yes.

10       Q.    Besides the auditing of MMQ's, did Cathy

11   Mallard have other concerns about Reis or Govoni

12   interfering with the operations?

13       A.    She did, but I don't recall exactly what

14   they were.

15            Cathy threatened to resign one time before,

16   and I convinced her that I would work with her to

17   try and keep them off her back.

18       Q.    Besides the concerns that Cathy identified

19   and what you have referred to yourself, are there

20   any other ways in which you believe Reis and Govoni

21   were interfering with the operation of the Embassy

22   House?

23       A.    Not that I recall.

24       Q.    Did Reis at one point tell you to bring in

2-147

1    somebody from another facility to do the MMQ audit?

2         A.    No.  He asked that I call to see if we

3    could coordinate it.

4         Q.    Who did he ask you to call?

5         A.    I forget who it was, but Cathy had denied

6    it.

7         Q.    Cathy denied what?

8         A.    That we call that person.  She said, "Don't

9    you dare call anybody in here to mess up what we've

10   worked hard to correct."

11        Q.    Even though you were given a directive by

12   Mr. Reis, you didn't follow that directive because

13   Cathy objected to it?

14        A.    Yes.

15        Q.    You never attempted to call the person to

16   arrange for this MMQ person to come to the facility?

17        A.    That's correct.

18        Q.    Wasn't this another administrator that

19   Mr. Reis or Mr. Govoni wanted you to call to get

20   permission to use their MMQ person?

21        A.    Yes.

22        Q.    You felt as an administrator, you could

23   defy your own boss because your DNS objected to the

24   procedure that they had ordered?

2-153

1   office when Jeff was discussing it with Cathy.

2       Q.   Do you remember what the gist of the

3   conversation was, why Govoni was discussing it with

4   her?

5       A.   I believe it was because they were over

6   budget on their hours.

7       Q.   Was that, in fact, the case, that nursing

8   was over budget in terms of its hours?

9       A.   I believe so.

10                  (Document marked as LeBlanc

11                  Exhibit 22 for identification)

12      Q.   I'm showing you what was marked as Exhibit

13  No. 22.  Take a moment to read that to yourself,

14  please.

15      A.   (Witness reviews document)  Okay.

16      Q.   Is that your signature on the second page

17  of this document?

18      A.   Yes.

19      Q.   Is that Mr. Govoni's signature as well?

20      A.   Yes, as far as I know.

21      Q.   The date on this performance improvement

22  form is July 15, 2003?

23      A.   Yes.

24      Q.   Do you remember receiving this document

2-154

1    from someone, either Mr. Govoni or Mr. Reis?

2        A.    Yes.

3        Q.    Who did you receive it from?

4        A.    Jeff Govoni.

5        Q.    Did you have any conversation with

6    Mr. Govoni when he gave you the document?

7        A.    Just that I denied everything that was

8    being said.

9        Q.    But besides denying it, did you discuss the

10   various things that were being said on this

11   document?

12       A.    Not that I recall.

13       Q.    Did he have any discussion with you?  Did

14   he run through the various items that he had written

15   down on this document?

16       A.    No.  It just appeared to be a nuisance for

17   him.

18       Q.    Why do you say it appeared to be a nuisance

19   for him?

20       A.    Because there was no discussion on it.  He

21   seemed like he didn't want anything to do with it.

22       Q.    Did he say anything that led you to

23   conclude that he didn't want anything to do with it,

24   or was it just your impression?

2-163

1      A.    I wasn't.

2      Q.    You were not?

3      A.    I don't remember being seen by them.

4      Q.    Did you take that day off as a vacation day

5  or personal day, or whatever you call it?

6      A.    No.

7      Q.    I guess I'm asking, did you go back to work

8  after your car was fixed?

9      A.    The car wasn't fixed.  It was towed.

10     Q.    Did you go back to work that day?

11     A.    I may have gone back that afternoon.  I

12 don't remember.  I think I did.  I think I remember

13 seeing Heidi.

14     Q.    If you could turn to the second page of

15 this document now.  In the top box it says, "Wage

16 survey due to District Director of Operations by

17 July 29, 2003," do you see that?

18     A.    Uh-huh.

19     Q.    You did not provide a wage survey by that

20 date, correct?

21     A.    Yes.

22     Q.    That's correct?

23     A.    Yes.

24     Q.    "Chart audit assistant request due by

2-164

1    July 30, 2003."  You didn't make the request by

2    July 30, 2003, correct?

3        A.    Yes.

4        Q.    It is correct?

5        A.    Yes.

6        Q.    "In the event of an absence or emergency, a

7    call must be placed to the Director of Operation's

8    Office as soon as is reasonably possible."

9            Did you have a problem with that

10   instruction in that last sentence?

11       A.    No.

12           MR. KERMAN:  Let's take a short break.

13           (Recess)

14   BY MR. KERMAN:

15       Q.    Next I'll show you this document.

16           MR. KERMAN:  Let's mark this as the next

17   exhibit.

18               (Document marked as LeBlanc

19               Exhibit 23 for identification)

20       Q.    Let me show you what was marked as Exhibit

21   No. 23.  Certainly you can take the time to read it,

22   Mr. LeBlanc, but I will represent this appears to be

23   the same thing as Exhibit 22, except I think this

24   version has some handwritten notations on it that

2-178

1    did do a wage survey, he would have sat on it anyway

2    if there was increases warranted.

3        Q.    So it would have been a waste of time to do

4    one in your judgment?

5        A.    It appeared to be.

6                    (Document marked as LeBlanc

7                    Exhibit 24 for identification)

8        Q.    Take a look at what I had marked as Exhibit

9    No. 24.  If you could just take a minute to review

10    that.

11        A.    (Witness reviews document)  Okay.

12        Q.    This is a document which, for the record,

13    it says, "Performance Improvement Form, Today's Date

14    8/18/03."  It's a two-page document.  Have you ever

15    seen this document before?

16        A.    (Examines document)  No.

17        Q.    You never did?

18        A.    Never.

19        Q.    Were you informed at some point that you

20    were being terminated from your employment?

21        A.    On August 22nd.

22        Q.    Who informed you that you were being

23    terminated?

24        A.    Gilbert Reis.

2-179

1      Q.     Was anyone else present when he informed
2    you?
3      A.     Jeff Govoni.
4      Q.     Was this in a meeting, a face-to-face
5    meeting that you had?
6      A.     Yes.
7      Q.     Where did it take place?
8      A.     In my office.
9      Q.     At Embassy House?
10     A.     That's correct.
11     Q.     Do you remember what day of the week
12   August 22nd was?
13     A.     It may have been a Friday.
14     Q.     Was anyone else present besides the three
15   of you?
16     A.     No.
17     Q.     As best you recall, I want you to tell me
18   everything that you remember was being said at that
19   meeting, whether Mr. Reis said it, Mr. Govoni said
20   it or you said it, as best you can remember.
21     A.     The best I remember is Gilbert Reis said to
22   me in front of Jeff Govoni that my services were no
23   longer required.
24     Q.     What else was said at the meeting?

2-180

1        A.    I had five minutes to turn in my keys and
2    clear my desk.
3        Q.    Did someone say those words, "You have five
4    minutes to turn in your keys and clear out your
5    desk"?
6        A.    Yes.
7        Q.    Who said that?
8        A.    Gilbert Reis.
9        Q.    What else was said at that meeting by any
10   one of the three of you?
11       A.    Nothing.
12       Q.    Mr. Reis didn't say anything else?
13       A.    Nothing.
14       Q.    Did Mr. Govoni say anything in this
15   meeting?
16       A.    Not that I remember.
17       Q.    Did you say anything at this meeting?
18       A.    No.
19       Q.    You didn't say a word?
20       A.    No.
21       Q.    You didn't question why you were being let
22   go or anything of that nature?
23       A.    No.
24       Q.    As of August 22, 2003, you had not done a

1    new wage survey as of that date, correct?

2         A.    No.

3         Q.    As of August 22, 2003, you hadn't called

4    the sister facility to try and arrange for their MMQ

5    person to come in, correct?

6         A.    I had not, no.

7         Q.    You don't have any knowledge that anyone

8    else had called to have that MMQ person come in from

9    the sister facility, correct?

10        A.    Correct.

11        Q.    In the last month of your employment, did

12   you forward any minutes of marketing meetings to

13   Mr. Reis and Mr. Govoni, during your last month of

14   employment?

15        A.    I don't remember.

16        Q.    Prior to your termination on August 22nd,

17   had you had any conversation with Mr. Reis or

18   Mr. Govoni about your employment status earlier in

19   that week?

20        A.    No.

21        Q.    Have you seen Exhibit 24 before today's

22   deposition, at any time?

23             MR. MANOFF:   He answered that question.

24             MR. KERMAN:   That he's never seen it at any

2-184

1   direct care to patients or residents of a nursing
2   home, a professional license?
3       A.    Yes.
4       Q.    What professional license do you have?
5       A.    I have a nursing home administrator's
6   license.
7       Q.    What type of patient care services does
8   that allow you to provide to residents?
9       A.    I'm not sure.
10      Q.    But you never provided any direct services
11  to the residents in terms of patient care or
12  anything like that?
13      A.    No.
14      Q.    Other than nursing home administrator, you
15  don't have any other professional healthcare
16  licenses, whether it be social worker, nursing
17  degrees?  Do you have any other professional
18  licenses?
19      A.    No.
20      Q.    Do you believe Kindred terminated your
21  employment because you objected to any unlawful
22  practices or objected to any unsafe patient care
23  practices?
24      A.    Yes.

1    Q.   Can you identify any facts in support of

2    your belief that Kindred terminated you because you

3    objected to either unlawful practices or practices

4    that cause danger to patients?

5        A.   The CORI, the CORI's being done.  That

6    would have an adverse effect on patients.

7        Q.   Anything else?

8        A.   Signing of cost reports.

9        Q.   How would that have an adverse effect on

10   patients?

11       A.   It wouldn't, but it was illegal; taking

12   beds out of circulation without authorization.

13       Q.   In what category do you put that in?

14       A.   Category?

15       Q.   I asked if you have any facts that support

16   your belief that you were terminated either because

17   of objecting to unlawful practices or objecting to

18   practices that endanger patient care.  You said

19   CORI's affected patient care, signing of cost

20   reports was unlawful, taking beds out of

21   circulation -- what category would you put that in?

22       A.   That's a state requirement.

23       Q.   So you are saying it's unlawful?

24       A.   It's an unlawful licensure requirement.

2-202

1          MR. MANOFF:  Objection.

2     A.    Well, we took an office, the activities

3 office, and we turned it into a rehab room.  I

4 insisted that we get permission on that.  That was

5 refused.

6     Q.    Do you think the position you took on that

7 contributed to your termination from employment?

8     A.    Yes.

9     Q.    What leads you to have that belief?  What

10 facts lead you to have that belief?

11    A.    Because Reis had ordered me to do it.

12    Q.    Is it your testimony that any time you

13 disagree with a supervisor, that that would

14 contribute to your termination?

15         MR. MANOFF:  Objection.

16    A.    Yes.

17    Q.    Are there any other facts that you can

18 identify that lead you to believe that there was a

19 link between the position you took on that

20 activities office and the subsequent firing?

21    A.    No.

22    Q.    This activities office, this was turned

23 into rehab office space, correct?

24    A.    Yes.

2-208

1    a therapy room, I don't know if that still applies,

2    but at some point in time, that square footage

3    requirement was in effect.

4         Q.    You don't know if what still applied,

5    whether you need to get state approval to convert an

6    activities room to rehab?

7         A.    Right.

8         Q.    So you don't know whether it was unlawful

9    or not.  You are simply saying you didn't want to

10   take the chance?

11        A.    Correct.  I thought we should have found

12   out what limitations we had, what we could and

13   couldn't do, from the officials.

14        Q.    You are not saying then going ahead and

15   doing what Mr. Reis did with regard to the

16   activities room to rehab room, you are not saying

17   that violated the law; you are simply saying you

18   would have wanted to find out whether the state

19   needed to approve that or not?  That's what you are

20   saying?

21             MR. MANOFF:  Objection.

22        A.    I believe that any type of conversion, they

23   have to be notified.

24        Q.    We're not talking about beds, though.  You

2-209

1   do realize there's a difference between licensure

2   and beds?

3       A.    Right.

4       Q.    And changing what one office is being used

5   for to another office.  Do you realize there's a

6   distinction between the two?

7       A.    Yes.

8       Q.    The fact that one thing may be unlawful

9   doesn't necessarily lead to the conclusion that the

10  other thing is unlawful?

11          MR. MANOFF:  Objection.  You are being

12  argumentative.

13          MR. KERMAN:  I'm not being argumentative.

14  I'm just asking.

15      A.    That's correct.

16      Q.    Again, the bottom line is you didn't know

17  whether what Reis was doing with the activities room

18  was lawful or unlawful; is that correct?

19          MR. MANOFF:  Objection.

20      Q.    You can answer.

21      A.    I was not sure.

22      Q.    Do you know how much money was invested by

23  the facility in terms of converting this space to

24  rehab space, as you say?

2-236

1  COMMONWEALTH OF MASSACHUSETTS)

2  SUFFOLK, SS.                    )

3      I, Ken A. DiFraia, Registered Professional

4  Reporter and Notary Public in and for the

5  Commonwealth of Massachusetts, do hereby certify

6  that there came before me on the 16th day of June,

7  2004, at 10:33 a.m., the person hereinbefore named,

8  who was by me duly sworn to testify to the truth and

9  nothing but the truth of his knowledge touching and

10  concerning the matters in controversy in this cause;

11  that he was thereupon examined upon his oath, and

12  his examination reduced to typewriting under my

13  direction; and that the deposition is a true record

14  of the testimony given by the witness.

15      I further certify that I am neither attorney or

16  counsel for, nor related to or employed by, any

17  attorney or counsel employed by the parties hereto

18  or financially interested in the action.

19      In witness whereof, I have hereunto set my hand

20  and affixed my notarial seal this _6th_ day of July,

21  2004.

22                    _Ken A. DiFraia_



23                    Notary Public

24  My commission expires 4/3/09

# EXHIBIT C

# FACILITY MEDICARE QUESTIONNAIRE

### Cost Report Verification

### Cost Report Year: 7/1/01-6/30/02

*LJL*
*Start date:*
*6/26/02*

I understand that any misrepresentation or false and misleading statement made on a Medicare or Medicaid cost report or in connection with such a filing may subject me personally and/or the company to criminal, civil, and/or administrative disallowances, fines and penalties (including imprisonment). I hereby verify that all books, records and other documentation maintained and submitted in support of this cost report filing are complete, true, and accurate to the best of my knowledge and belief.

Print Administrator Name  *Larry LeBlanc*

* Signature of Administrator  *[signature]*     Date  *8/22/02*

* *Please note that this signature, attests to information provided on Medicare Questionnaire completed by Business office Manager only. It does not attest to statements made on medicare/medicaid cost reports.*

2



# EXHIBIT D

# FACILITY MEDICAID QUESTIONNAIRE

## FOR THE PURPOSE OF FILING THE
## MEDICAID COST REPORT
### PERIOD 01/01/02 TO 12/31/02



## ATTENTION ADMINISTRATOR

## PLEASE SIGN WHERE INDICATED

## COMPLETE AND RETURN TO:

### Reimbursement Department

## BY FRIDAY, FEBRUARY 28, 2003

Facility Name _____*Embassy House*_____

Facility Number _____*583*_____

Print Name of Preparer _____*Heidi Mason*_____

Signature of Preparer _____*Heidi Mason*_____

### Cost Report Verification

derstand that any misrepresentation or false and misleading statement made on a Medicare or Medicaid cost report or in nection with such a filing may subject me personally and/or the company to criminal, civil, and/or administrative disallowances, s and penalties (including imprisonment). I hereby verify that all books, records and other documentation maintained and nitted in support of this cost report filing are complete, true, and accurate to the best of my knowledge and belief.

*Signature of administrator in no way verifies the*
*uracy of cost report. It does verify information on enclosed*
*remie submitted by Bony of facility.*

Print Administrator Name _____*LARRY LEBLANC*_____

Signature of Administrator _____ Date _*2/25/03*_

# EXHIBIT E



# Memo



**To:**   Larry LeBlanc

**From:**   Gilbert Reis

**Date:**   11/01/02

**Re:**   Performance: FINAL DISCIPLINARY ACTION

---

I have serious concerns about your performance in you current position. My concerns include but are not limited to:

1. Misrepresentation to Gilbert about resident care and safety issues (such as showers not given)

2. Not supportive of mission, dementia unit, i.e. delay with program director's appointment and the unit's environment readiness.

3. Misrepresentation about staff attitude toward dementia unit: "Nurses not supportive of program"

4. Undermining Gilbert with staff

5. Leadership of staff: morale poor, not providing consistent support of staff

6. Absent from building for long periods of time with out telling staff that he is leaving or how to reach him, putting building in jeopardy

7. Failed to show to meeting: ops review and district PI meeting

8. Failed to follow directive with maintenance director replacement

9. Benefit enrollment by CBIZ had to be postponed because schedule was not prepared.

You are being placed on final disciplinary warning. You must act as a responsible team player, be truthful with me and your staff, be present during working hours, let me know before you leave the facility during working hours, let staff know how to reach you if you need to leave the building. Failure to improve performance will result in immediate termination.

Larry LeBlanc

*Respectfully deny said allegations*
*11/1/02*
*(1-9)*

Date

Gilbert Reis

*November 1, 02*

Date

# EXHIBIT F




**Kindred** Healthcare

## Performance Improvement Form

(Press TAB or your mouse to maneuver between fields or lines. Do not press "Enter")

| Employee name: Larry Leblanc | Today's date 6/16/03 |
|---|---|
| Department/facility | Date of hire: |
| Position Administrator | Supervisor: Jeffrey Govoni |

### REASON FOR COUNSELING/CORRECTIVE ACTION

The employee continues to demonstrate a lack of leadership with the maintenance and development of census growth. On 6/13/03 following a SWOT analysis of Embassy House the employee was asked by the District Sales and Marketing Director if he would be following up this meeting with a marketing meeting next week. His initial response was "no". The employee on several occasions has questioned his own willingness to continue as the Administrator of Embassy House. This attitude has a direct effect on the mood of the facility.

### HAS THIS CONCERN BEEN PREVIOUSLY DISCUSSED WITH THE EMPLOYEE? LIST ANY PREVIOUS COUNSELING SESSIONS/CORRECTIVE ACTIONS.

Verbal discussions have taken place concerning leadership on 6/3/03. At that time the employee was instructed by the District Director of Operations that the Administrator is responsible to oversee and direct all aspects of daily operations.

### EXPECTED LEVEL OF PERFORMANCE

Employee will comply with all Kindred Policy and Procedures. Employee will react to situations in a professional manner. Employee will develop plans and oversee follow through of those plans to ensure the growth on census at Embassy

### COUNSELING/CORRECTIVE ACTION (Please mark with 'x')

- [ ] Verbal counseling
- [ ] Written warning
- [x] Final written warning
- [ ] Discharge
- [ ] Extension of orientation period
- [ ] Demotion
- [ ] Suspension
- [ ] Other

*Jeff Govoni comment when he delivered this final written warning was "There to do Albert's dirty work", threw the warning on conference table and left (no signature).*

**CORRECTIVE ACTION PLAN:**

Employee will hold weekly marketing meetings. Minutes to be sent to Area Administrator and D.O. Employee will act in a professional manner.

**TIME FRAME FOR IMPROVEMENT:**

Immediately

**FOLLOW-UP REVIEW DATE:**     7/16/03

*It is essential that immediate steps are taken to improve and maintain performance to the required level. If demonstrated material improvement is not made during this time frame, or if performance deteriorates during or after this time, further action, up to and including discharge, may be taken before the end of this time period or after this time period.*

**EMPLOYEE COMMENTS:** (Attach a separate sheet if necessary)

Respectfully deny said allegations, D.O. and administrator (area) have interfered with the operations of the facility.

**Has employee been reminded of the Open Door Policy**     ☒ Yes     ☐ No

**Signatures**

_____     _____     _____     _____
Supervisor                         Date                  Department Head                     Date

*I have been provided a copy of this form and a full opportunity to discuss it with my supervisor. I have read and fully understand the information provided above. I understand that my signature indicates acknowledgment of having been counseled and/or warned and does not necessarily indicate agreement with my supervisor's statement.*

_____     _____     _____     6/16/03
Witness (if employee refuses to sign)    Date        Employee                           Date

PLACE FORM IN EMPLOYEE'S PERSONNEL FILE

# EXHIBIT G



**Performance Improvement Form**

*(Press TAB or your mouse to maneuver between fields or lines. Do not press 'Enter'.)*

| Employee name: Larry Leblanc | Today's date 7/15/03 |
|---|---|
| Department/facility | Date of hire: |
| Position Administrator | Supervisor: Jeffrey Govoni |

On 6/3/03 during meeting with District Director of Operations and Area Administrator the employee was requested to complete a wage survey of competition in the area. He was directed to have this to the District Director with in two weeks. Not completed as of 7/15/03.

During MOR's with District Director of Operations and Area Administrator the employee was requested to contact sister facilities MMQ nurse to for assistance auditing charts. This meeting was held the week of 6/9/03. Not completed as of 7/15/03.

On 6/17/03 Employee did not report to scheduled Administrator's meeting. Employee did not notify Area Administrator or District Director of Operations nor was a called placed to their offices to notify them of his absence.

Verbal discussions have taken place concerning leadership on 6/3/03. At that time the employee was instructed by the District Director of Operations that the Administrator is responsible to oversee and direct all aspects of daily operations.

Written warning given on 6/16/03 for lack of leadership shown by initial refusal to hold marketing meetings and openly questioning his willingness to continue as the Administrator of Embassy House.

Employee will comply with all Kindred Policy and Procedures. Employee will react to situations in a professional manner. Employee will develop plans and oversee follow through of those plans to ensure the growth of Embassy

| | |
|---|---|
| ☐ Verbal counseling | ☐ Extension of orientation period |
| ☐ Written warning | ☐ Demotion |
| ☒ Final written warning | ☐ Suspension |
| ☐ Discharge | ☐ Other |



Wage survery due to District Director of Operations by 7/29/03

Chart Audit Assistance Request due by 7/30/03

In the event of an absence or emergency a call must be placed to the Director of Operations Office as soon as reasonably possible.

Immediate

8/5/03

*It is essential that immediate steps are taken to improve and maintain performance in the required level. If demonstrated material improvement is not made during this time frame, or if performance deteriorates during or after this time, further action, up to and including discharge, may be taken before the end of this time period or after this time period.*

This is the second final written warning
that I respectfully deny said allegations

☒ Yes    ☐ No

**Signatures**

_(signature)_ 7/5/03

Supervisor                          Date                    Department Head                    Date

*I have been provided a copy of this form and a full opportunity to discuss it with my supervisor. I have read and fully understand the information provided above. I understand that my signature indicates acknowledgment of having been counseled and/or warned and does not necessarily indicate agreement with my supervisor's statement.*

_(signature)_ 7/15/03

Witness (if employee refuses to sign)    Date          Employee                        Date

PLACE FORM IN EMPLOYEE'S PERSONNEL FILE

# EXHIBIT H





**Performance Improvement Form**

<small>(Press TAB or your mouse to maneuver between fields or lines. Do not press "Enter")</small>

| | |
|---|---|
| Employee name:  Larry Leblanc | Today's date 8/18/03 |
| Department/facility | Date of hire: |
| Position Administrator | Supervisor: Jeffrey Govoni |

**REASON FOR COUNSELING/CORRECTIVE ACTION:**

Employee has failed to complete wage survey that was due to the Director of Operations by 7/29/03
Employee has failed to request chart audit assistance that was due by 7/30/03.
Employee has failed to forward any minutes to weekly marketing meetings.

**HAS THIS CONCERN BEEN PREVIOUSLY DISCUSSED WITH THE EMPLOYEE? LIST ANY PREVIOUS COUNSELING SESSIONS/CORRECTIVE ACTIONS:**

Employee was given a written warning on 7/15/03 with corrective action plan of completing wage survey and requesting chart audit assistance.

Employee was given a written warning on 6/16/03 with corrective action plan of holding weekly marketing meetings and forwarding them to the Area Administrator and Director of Operations.

**EXPECTED LEVEL OF PERFORMANCE:**

**COUNSELING/ CORRECTIVE ACTION**
(Please mark with "X")

☐ Verbal counseling          ☐ Extension of orientation period

☐ Written warning            ☐ Demotion

☐ Final written warning      ☐ Suspension

☒ Discharge                  ☐ Other

**CORRECTIVE ACTION PLAN:**

**TIME FRAME FOR IMPROVEMENT:**

**FOLLOW-UP REVIEW DATE:**        7/16/03

It is essential that immediate steps are taken to improve and maintain performance to the required level. If demonstrated material improvement is not made during this time frame, or if performance deteriorates during or after this time, further action, up to and including discharge, may be taken before the end of this time period or after this time period.

**EMPLOYEE COMMENTS:  (Attach a separate sheet if necessary)**

| Has employee been reminded of the Open Door Policy | ☒ Yes | ☐ No |

**Signatures**

_____        _____        _____        _____
Supervisor                                                    Date                    Department Head                                    Date

I have been provided a copy of this form and a full opportunity to discuss it with my supervisor. I have read and fully understand the information provided above. I understand that my signature indicates acknowledgment of having been counseled and/or warned and does not necessarily indicate agreement with my supervisor's statement.

_____        _____        _____        _____
Witness (if employee refuses to sign)        Date                    Employee                                                      Date

PLACE FORM IN EMPLOYEE'S PERSONNEL FILE

# EXHIBIT I

1

 Volume 1
Pages 1-122
Exhibits:  See index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-CV-10193RCL

- - - - - - - - - - - - - - -

LARRY J. LEBLANC,                :
            Plaintiff            :
                                 :
    v.                           :
                                 :
KINDRED NURSING CENTERS          :
EAST, LLC, d/b/a EMBASSY         :
HOUSE,                           :
            Defendant            :

- - - - - - - - - - - - - - -

    DEPOSITION OF **GILBERT C. REIS**, taken
on behalf of the Plaintiff, pursuant to
the applicable provisions of the Federal
Rules of Civil Procedure, before Carol A.
Fierimonte, Certified Shorthand Reporter
and Notary Public within and for the
Commonwealth of Massachusetts, (#134693),
at the Law Office of Paul A. Manoff, 47
Winter Street, Boston, Massachusetts, on
Thursday, **August 5, 2004**, commencing at
10:25 a.m.

SHEA COURT REPORTING SERVICES
(617) 227-3097

1    Q.    Okay.  And where was she working as a

2          trainee?

3    A.    In a facility owned by Kindred.

4    Q.    That was under your supervision?

5    A.    Right.

6    Q.    So you did know her?

7    A.    Yes, I did.

8    Q.    Okay.  What was your job as of the time

9          Mr. LeBlanc was terminated?

10   A.    I was Director of Operations.

11   Q.    And what did you do as Director of

12         Operations?

13   A.    Supervised the 12 nursing centers.

14   Q.    Okay.  Those nursing centers, that is the

15         same as saying a nursing home?

16   A.    Right.

17   Q.    Okay.  And the administrators of the

18         nursing homes reported directly to you?

19   A.    Correct.

20   Q.    Okay.  And for how long were you a

21         Director of Operations for Kindred?

22   A.    From '86 to 2003.

23   Q.    So 17 years?

24   A.    Yes.

1         you oversaw.

2    A.   Right.

3    Q.   Why was Mr. Govoni given one in

4         particular, Embassy House, to oversee that

5         he wasn't the administrator at?

6    A.   Because he had demonstrated, demonstrated

7         his abilities and also expressed interest.

8    Q.   Well, so you wanted to start him with just

9         one other home to oversee?

10   A.   Right.

11   Q.   I understand.  Why did you pick Embassy

12        House of all your 12?

13   A.   Why?

14   Q.   Why?

15   A.   Because this, this facility operationally

16        was, was not doing well.  And Larry was

17        new to Kindred, to the systems and

18        programs.  And I thought that Jeff would

19        be, would have the time to work with

20        Larry.

21   Q.   Okay.  For how long a period had Embassy

22        House not been doing well?

23   A.   The facility did well in 2002 and

24        progressively deteriorated starting with

25

1      2003.

2   Q.   How many beds did Embassy House have?

3   A.   123.

4   Q.   Okay.  And was that considered bigger than

5        average, smaller than average or average

6        for Kindred's facilities?

7   A.   Average size.

8   Q.   Did you ever have any conversations with

9        Mr. LeBlanc about his willingness or

10       unwillingness to sign Medicaid or Medicare

11       cost verification reports?

12  A.   Yes, I did.

13  Q.   Okay.  And how many times did you have

14       discussions with Mr. LeBlanc about that?

15  A.   Two, two to three times.

16  Q.   Two or three times?

17  A.   Yes.

18  Q.   Okay.  And do you remember when the first

19       time was?

20  A.   Yes.  Larry called to ask --

21  Q.   Well, we are just going to go on the times

22       first.  We will get to the conversations

23       later.  But what was the first occasion

24       approximately?

```
 1              THE WITNESS: Should I answer?

 2              MR. KERMAN: Yes.  Do you

 3         understand the question or if you want it

 4         to be repeated.

 5              THE WITNESS:  I understand what

 6         he is getting at.

 7    A.   But I am going to say that Embassy House

 8         was having a problem with census, total

 9         occupancy running on the average 15 to 20

10         beds down.

11    Q.   Down from what, its capacity?

12    A.   From its capacity.

13    Q.   Yes.

14    A.   And there was a discussion with Larry

15         about converting on a temporary basis a

16         resident room into a rehab gym.

17    Q.   Converting what?

18    A.   A resident room, three bedroom.

19    Q.   Three bedroom, yes.

20    A.   Into a rehab gym.

21    Q.   Rehab what?

22    A.   Gymnasium.

23    Q.   Gymnasium.  Okay.  And --

24    A.   Yes.
```

1   Q.  What was the discussion you had with Mr.
2       LeBlanc about converting the three beds
3       into a rehab gymnasium?
4   A.  Along the lines we have all these empty
5       beds, there is an opportunity to make
6       available a larger area for to provide
7       rehab services to our residents, let's go
8       ahead and do it.
9   Q.  Okay.  Did Mr. LeBlanc say that you needed
10      state approval?
11  A.  He may have.
12  Q.  He may have.  And did you tell him to
13      ignore the state?
14  A.  Not needed.
15  Q.  That it was not needed?
16  A.  Not needed.  This was a temporary
17      situation.
18  Q.  Okay.
19  A.  By the way, I had done this at that same
20      facility a couple of years before.
21  Q.  All right.  Are there rules about whether
22      or not you need to get state approval to
23      reduce the number of beds?
24  A.  There are if you are going to do it

1      permanently.

2  Q.  Okay.

3  A.  Permanently.

4  Q.  But if you are doing it temporarily, then

5      you don't need to --

6  A.  No.

7  Q.  You don't need to get state approval?

8  A.  No.

9  Q.  Okay.  And is there a rule about how long

10     a temporary change can be?  I mean if you

11     are going to reduce it temporarily for ten

12     years, I take it, that wouldn't work?

13              MR. KERMAN: Objection.

14  A.  Yes.  You are probably right.

15  Q.  So is there a cut-off period where a

16     temporary goes over the permanent?

17  A.  There might be.  I am not aware.

18  Q.  Okay.  Well, how long were you planning on

19     making this temporary change for?

20  A.  My goal would be to be just months until

21     we filled the beds.

22  Q.  How many months?

23  A.  As soon as we filled the beds.

24  Q.  Well, did you discuss with Mr. LeBlanc how

53

1    A.    No.

2    Q.    Okay.  Was there any equipment or

3          furniture that was cited as dangerous that

4          needed to be replaced?

5    A.    Dangerous?  I don't recall, no.

6    Q.    Okay.  Who -- well, did you have any

7          discussions with Mr. LeBlanc about some

8          improvements being made on the parking lot

9          or driveway of the abutter to the nursing

10         home?

11   A.    Yes, I did.

12   Q.    Okay.  And who was this abutter?  Was this

13         a restaurant?

14   A.    A restaurant.  They own the parking lot.

15   Q.    They own the parking lot.  Whose parking

16         lot was it?

17   A.    It is Christo's.

18   Q.    Who parked their cars in the parking lot?

19   A.    Our employees.

20   Q.    Okay.  And they didn't use it for their

21         restaurant?

22   A.    No.

23   Q.    Was there some arrangement between

24         Christo's and the nursing home relative to

54

1           utilizing the parking lot?

2     A.    Yes.

3     Q.    Was the arrangement in writing?

4     A.    This arrangement goes back pre my days.

5           It goes back 25, 30 years.

6     Q.    Okay.  I am not questioning that.  I am

7           just asking you was the arrangement in

8           writing or was it an informal arrangement?

9     A.    I don't know.  I couldn't tell you.

10    Q.    You don't know if it was in writing.  And

11          did the nursing home have to pay money to

12          use the parking lot?

13    A.    No.

14    Q.    So the parking lot was freely given to the

15          nursing home to use?

16    A.    Right.

17    Q.    Okay.  And did you want changes made to

18          the parking lot?

19    A.    I wanted to resurface it.

20    Q.    Resurface.  Did you have a discussion with

21          Mr. LeBlanc about whether you needed the

22          approval of Christo's to do that?

23    A.    He raised the question.

24    Q.    Okay.  And what did you tell him?

1    A.    I consulted with my boss and equally Jeff,

2          and we agreed.

3    Q.    Who was your boss?

4    A.    Donna Kelsey.

5    Q.    Donna Kelsey?

6    A.    Right.

7    Q.    Okay.  And what were the reasons you

8          determined to discharge Mr. LeBlanc?

9    A.    For poor performance.

10   Q.    And what was the poor performance?

11   A.    Financial.

12   Q.    Financial what?

13   A.    Financial performance, clinical issues.

14   Q.    Well, specifically what were the issues?

15   A.    Census issues, accounts receivables

16         issues, labor issues, noncompliance with

17         policies and procedures.

18   Q.    Okay.  Well, what were the noncompliance

19         with policies and procedures?

20   A.    An example, performance improvement

21         meetings, accounts receivables directives,

22         and other programs.

23   Q.    Well, specifically, you told me that he

24         was not in compliance with policies and

66

1          procedures of the company.  What policies

2          and procedures was he not in compliance

3          with?

4    A.   I gave you an example.  Accounts

5          receivables.  Okay.  The policy was that

6          he would review receivables on a weekly

7          basis with the business office manager.

8    Q.   Okay.  Review them with the business

9          manager?

10   A.   Right.

11   Q.   For what purpose?

12   A.   For the purpose of monitoring.

13   Q.   Helping collect them?

14   A.   Exactly.

15   Q.   Okay.  So what did he do that -- what did

16         he fail to do in that regard?

17   A.   He didn't meet with the business office

18         manager and, therefore, we had problems.

19   Q.   Heidi Mason?

20   A.   Right.

21   Q.   Okay.  How do you know he didn't do that?

22   A.   I know that.

23   Q.   Well, who told you?

24   A.   There were no reports as well as the

1    results.  The results were obvious to me

2    that none of that was going on.

3    Q.  Well, okay.

4    A.  And he also told me.

5    Q.  He told you he wasn't meeting with her?

6    A.  I knew, yes.

7    Q.  You told him to meet with her every week

8    to go over the receivables?

9    A.  That was a company expectation.

10   Q.  And what did he say?

11   A.  He wasn't meeting.

12   Q.  He said, I am not going to meet with her,

13   that is a waste of time?  What did he say?

14   A.  No, he did not say that.  But he wasn't

15   meeting with her.

16   Q.  Well, how do you know that?

17   A.  I know that from, I know that from, from

18   the business office manager as well as

19   him.  And also from review and conducting

20   my own reviews with the business office

21   manager and him.  I knew that based on the

22   information that he was giving me, I knew

23   that he wasn't reviewing.

24   Q.  Okay.  Well, did you ask him, How come you

68

1          are not meeting with Heidi based on a

2          weekly basis like I told you to?

3     A.   I may have, yes.

4     Q.   And what did he say?

5     A.   He wasn't -- he wasn't doing it.

6     Q.   Well, did you ask him why?

7     A.   He just didn't see the importance of it, I

8          guess.

9     Q.   Well, anything else that he said about

10         that issue?

11    A.   Not, you know, that I recall or specifics,

12         no.

13    Q.   Okay.  What is an accounts receivable,

14         that is a debt owed to the nursing home?

15    A.   Right.

16    Q.   By whom?

17    A.   By private pay.

18    Q.   Private pay, private residents?

19    A.   Residents, yes.

20    Q.   Okay.  What percentage of the nursing home

21         residents were private?

22    A.   I would say about five to ten percent.

23         But all the Medicaids owe a private

24         portion of the monthly expense.

1          apart again.

2    Q.    What do you mean by fall apart, do you

3          mean the department heads were not

4          following through?

5    A.    No follow through, yes.  No follow-up.

6    Q.    Did you again speak with Mr. LeBlanc about

7          this?

8    A.    It was discussed many times.

9    Q.    And what did Mr. LeBlanc say?

10   A.    He offered excuses.

11   Q.    Okay.  What were the excuses he offered?

12   A.    I don't recall.

13   Q.    Okay.  And you said there was a problem

14         about performance improvement?

15   A.    Yes.

16   Q.    What does that mean?

17   A.    Monthly -- it is a quality assurance

18         program.  Monthly the team has to meet.

19         It is chaired by the administrator.  And

20         they have to go over key factors and

21         assess where they are and discuss whether

22         or not we are being compliant.  If not,

23         develop action plans to resolve whatever

24         problems they had.

1    Q.    Compliance with what?

2    A.    From pressure ulcers to falls to accounts

3          receivables to labor issues to

4          housekeeping, environment issues.

5    Q.    So what was the problem here?

6    A.    He wasn't holding the meetings.

7    Q.    Okay.  Again, failure to hold the

8          meetings?

9    A.    Right.

10   Q.    Did you discuss this issue with Mr.

11         LeBlanc, that he wasn't holding these

12         meetings?

13   A.    Yes.  There was discussion.  There was

14         help available.

15   Q.    Well, what did Mr. LeBlanc say?  Did you

16         say, How come you are not holding the

17         meetings?

18   A.    Yes.  We discussed, we discussed that,

19         yes.

20   Q.    What did he say?

21   A.    First of all, for one thing, he didn't

22         have the knowledge and skills to hold the

23         meetings.  And I made other administrators

24         available to help him with that.

1    Q.   Who said he didn't have the knowledge and

2        the skills?

3    A.   I assessed that.

4    Q.   Okay.  But what did Mr. LeBlanc say?  You

5        said you discussed this issue with him

6        several times?

7    A.   He needed help.  He accepted the help.

8    Q.   So what was the problem then?  You gave

9        him help, what was the problem?

10   A.   He still wasn't doing it right even after

11       the help.

12   Q.   What wasn't he doing right?

13   A.   He wasn't conducting the meetings and

14       assessing and evaluating.

15   Q.   Well, did you ask him why he wasn't doing

16       it?

17   A.   He couldn't do that.

18   Q.   He said that?

19   A.   He couldn't do it.

20   Q.   Well, did you ask him?

21   A.   He just couldn't do it.

22   Q.   That is what he said?  Is that your

23       opinion or what he said?

24   A.   That is my opinion.

1           facility to work with the MMQ nurses in

2           his facility?

3    A.     Right.

4    Q.     Okay.  And what did Mr. LeBlanc say in

5           that regard?

6    A.     He didn't follow through.

7    Q.     Did you ask him why?  Who told him to do

8           that, you or Govoni told him to do that?

9    A.     Well, Jeff and I.

10   Q.     And did you ask him why he wasn't doing

11          that?

12   A.     He just didn't do it.

13   Q.     Well, again, did you ask him why?

14   A.     Yes, we did.  He just didn't do it.

15   Q.     What did he say?

16   A.     He didn't have the time.  He just didn't

17          do it.

18   Q.     He said he didn't have the time.  Okay.

19          When these MMQ nurses were supposed to

20          come in, was Mr. LeBlanc going to meet

21          with them or were they going to work with

22          the MMQ nurses in his facility?

23   A.     They would come in and meet with them,

24          find out from him what the problems were,

94

1        what he thought the problems were, and

2        then they would meet with the staff at the

3        facility and go over the records and try

4        to discover what problems, why, why given

5        the acuity mix that we had, why

6        reimbursement was so low.

7    Q.   And what does that mean, acuity mix?

8    A.   The level of services provided to

9        residents.

10   Q.   You mean you weren't getting all the

11        services reimbursed?

12   A.   Correct.

13   Q.   Okay.  So did Mr. LeBlanc ever tell you

14        that his nursing staff didn't want to meet

15        with the outside nurses?

16   A.   No.

17   Q.   He never heard that?

18   A.   No.

19   Q.   Okay.  Well, who would have met with the

20        outside nurses, the Director of Nursing?

21   A.   Director of Nursing, Administrator, and

22        the facility MMQ nurses.

23   Q.   Okay.  And did Mr. LeBlanc ever discuss

24        with you Ms. Mallard's opinion about

1          contract labor expenses he was incurring?

2    A.    Yes, I did.

3    Q.    And could you tell me the substance of

4          what you discussed with Mr. LeBlanc on

5          that issue?

6    A.    Larry, we had been talking about the

7          problems, the escalating labor costs.  And

8          he asked for help with wage adjustments.

9          And I told him how to go about it, to --

10         the first step was to survey the

11         competition, find out where others were

12         before we made any adjustments.  And also,

13         I walked him through the process.  There

14         is a protocol that we follow, the same

15         protocol that I have gone through with him

16         in 2002 when we adjusted wages.  Larry

17         didn't follow-up or follow through.  And

18         consequently, you know, labor costs just

19         kept rising.

20   Q.    And did you document his failure to

21         follow-up with this wage survey in any

22         warnings that were issued to him in 2003?

23   A.    Yes, I did.

24               MR. KERMAN:  I have no further

122

COMMONWEALTH OF MASSACHUSETTS)
                              )    ss.
COUNTY OF NORFOLK             )


    I, Carol A. Fierimonte, a Notary
Public within and for the Commonwealth of
Massachusetts, duly commissioned,
qualified and authorized to administer
oaths and to take and certify depositions,
do hereby certify that heretofore, on the
date cited above, the witness personally
appeared before me at the above location
and testified in the above-captioned case;
that the said witness was by me duly sworn
to testify to the truth, the whole truth
and nothing but the truth; that thereupon
and while said witness was under oath, the
deposition was taken down by me in machine
shorthand at the time and place therein
named and was reduced to typewriting
thereafter.


    I further certify that the said
deposition constitutes a true record of
the testimony given by the said witness.


    I further certify that I am not
interested in the event of this action.


    IN WITNESS WHEREOF, I have hereunto
subscribed my hand this 19th day of
August, 2004.


                    _____
                    Notary Public in and for the
                    Commonwealth of Massachusetts

                    My Commission expires
                    September 9, 2005

# EXHIBIT J

Pages: 1-56
Exhibits: None

COPY

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A.#: 04-CV-10193RCL


* * * * * * * * * * * * * *

LARRY J. LEBLANC,

     Plaintiff

 VS.

KINDRED NURSING CENTERS EAST, LLC,

d/b/a EMBASSY HOUSE,

     Defendant

* * * * * * * * * * * * * *

        DEPOSITION OF JEFFREY GOVONI, a

witness called by and on behalf of the

Plaintiff, pursuant to the provisions of

the Federal Rules of Civil Procedure,

before Joan Applegate, a Certified Shorthand

Reporter and Notary Public in and for the

Commonwealth of Massachusetts, at the Law

Offices of Paul Manoff, 47 Winter Street,

Boston, Massachusetts, on Friday,

September 10, 2004 commencing at 1:00 p.m.

```
 1         become a nursing home administrator?
 2    A.   Yes.
 3    Q.   What training did you receive?
 4    A.   I was in an administrator-in-training
 5         program.
 6    Q.   Who ran that?
 7    A.   It was through Olympus Healthcare.
 8    Q.   When did you take that?
 9    A.   I don't remember the exact dates.
10    Q.   What did Mr. Reis tell you insofar as
11         becoming an area administrator and
12         overseeing this second nursing home as well?
13    A.   What -- could you ask that again?
14    Q.   In May of 2003 Mr. Reis approached you about
15         overseeing Embassy House as well?
16    A.   Correct.
17    Q.   What did he tell you?
18    A.   He asked me at that time if I would be
19         willing to oversee Embassy House to assist
20         Larry LeBlanc in improving that home's
21         financial and clinical results in the
22         building.
23    Q.   Did he say what results needed to be
24         improved?
```

1   A.   There was an expense issue as well as a

2        revenue issue in that building.

3   Q.   That means revenues were less than fore-

4        casted and expenses were higher?

5   A.   Correct.

6   Q.   Did he tell you specifically what the

7        problems were with the revenues and the

8        expenses?

9   A.   I don't remember any detailed conversation

10       with him.

11  Q.   Was the revenues, lack of revenues due to

12       fewer patients or residents?

13  A.   That was my findings once I went in there,

14       yes.

15  Q.   Would there be some other way that you could

16       have a less than projected revenue?

17  A.   Yes.

18  Q.   What could the other ways be?  What causes

19       could there be for a less than projected

20       revenue?

21  A.   There's several different possibilities.

22       One of them, which would be the MMQ scores

23       of the patients in your building, the equity

24       that you were taking credit for in the

1        were fewer patients than they should have

2        had, or was it the problem that the

3        projections were unreasonable considering

4        the facility?

5    A.  My opinion is that the facility had not done

6        what it needed to do to improve the census

7        in that building.

8    Q.  The census means the bed count?

9    A.  Correct, the number of patients in the beds.

10   Q.  Did you discuss that with Mr. LeBlanc?

11   A.  Yes.

12   Q.  What did you tell Mr. LeBlanc in that

13       regard?

14   A.  We discussed that we needed to start

15       marketing meetings in that building to help

16       in improving the census.

17   Q.  What's a marketing meeting?

18   A.  A marketing meeting would be a meeting with

19       key staff in your building and potentially

20       staff, regional staff to discuss options

21       that were available that the facility could

22       do to improve census.

23   Q.  Did you do that at the nursing home where

24       you were the administrator?

```
 1   A.   Yes, I did.

 2   Q.   What options did you think were available to

 3        Embassy House to improve its census?

 4   A.   One of the major areas that could be

 5        affected is the location of Embassy House

 6        was directly adjacent to Brockton Hospital.

 7        The feeling was that if we worked closer

 8        with Brockton Hospital, that we could

 9        improve census if we got more involved with

10        their doctors, if we had community events in

11        the facility to help bring individuals from

12        the community in.  And there was also a low

13        income housing tenement on the other side of

14        the building that we believed through

15        marketing our rehab department we could

16        improve census by bringing those individuals

17        in when they needed those services.

18   Q.   How does connecting with Brockton Hospital

19        help to improve your census?

20   A.   Brockton Hospital was the main referral

21        source for that facility.

22   Q.   So in other words, the hospital refers

23        patients in need of your services to nursing

24        homes?
```

```
 1   A.   Right.

 2   Q.   Were they referring all of their patients

 3        who needed nursing homes to Embassy House,

 4        or were they referring them to other places?

 5   A.   My assumption would be they referred them to

 6        all local nursing homes.

 7   Q.   How many nursing homes were there in the

 8        ten-mile radius of Embassy House?

 9   A.   I can't speak on that.  I don't know.

10   Q.   Were there any?

11   A.   Yes.

12   Q.   Did you discuss that issue with Mr. LeBlanc?

13   A.   We discussed his competition, yes.

14   Q.   Did Mr. LeBlanc offer any opinions as to

15        what the problems were in getting more

16        patients for the nursing home?

17   A.   Larry had opinions surrounding the physical

18        plant of the building.

19   Q.   There were problems at the physical plant?

20   A.   Prior to me going in there, yes.

21   Q.   What problems did he say there were with the

22        physical plant?

23   A.   He felt there was a need for more furniture.

24   Q.   Anything else he said that he thought were
```

```
 1         causes of having fewer patients than
 2         anticipated?
 3    A.   Not that I can recall.
 4    Q.   What suggestions did you offer to him to
 5         improve the census?
 6    A.   I recommended that we have marketing
 7         meetings.
 8    Q.   Were you going to attend the marketing
 9         meetings as well?
10    A.   Would I have attended the marketing
11         meetings?  Yes.
12    Q.   You planned on it?
13    A.   I can't say that I would have attended every
14         marketing meeting.
15    Q.   Did you indicate to him how often he should
16         have these marketing meetings?
17    A.   Yes.
18    Q.   What did you say?
19    A.   Weekly.
20    Q.   Weekly.  Had he been holding marketing
21         meetings at the nursing home?
22    A.   No.
23    Q.   Was this something that is required of all
24         nursing home administrators for Kindred, to
```

```
 1        weekly?
 2   A.   Due to the census issues that he was having
 3        in his building, it was felt that he should
 4        hold them weekly.
 5   Q.   What percentage of projections was the
 6        nursing home meeting at that time?
 7   A.   I don't recall.
 8   Q.   Approximately?  Was it 80 percent,
 9        60 percent?  Do you have any estimate?
10   A.   I don't recall.
11   Q.   What did Mr. LeBlanc say in response to your
12        suggestion that he should do weekly
13        marketing meetings?
14   A.   The first time that it was discussed with
15        him his response was that he would not.
16   Q.   Did he say why?
17   A.   He did not feel it would be useful.
18   Q.   Did he say why?
19   A.   No, he just simply said he didn't feel it
20        would be useful.
21   Q.   Did you report that to Mr. Reis?
22   A.   Yes, I did.
23   Q.   What did Mr. Reis say?
24   A.   He said that the facility needed to hold
```

```
 1        marketing meetings.

 2   Q.   So you went back and told Mr. LeBlanc that

 3        again?

 4   A.   Correct.

 5   Q.   You told him Mr. Reis concurred in that?

 6               MR. KERMAN:   Could you repeat that?

 7   Q.   You told him Mr. Reis concurred in your

 8        feeling that he should be holding weekly

 9        marketing meetings?

10   A.   Yes.

11   Q.   What was Mr. LeBlanc's response?

12   A.   At the time he said he would hold the

13        meetings.

14   Q.   Did you have any further conversation with

15        him about holding marketing meetings?

16   A.   I did.

17   Q.   What further conversations did you have with

18        him about holding marketing meetings?

19   A.   I requested minutes to the meetings.

20   Q.   Who was to keep the minutes?

21   A.   That would be up to Embassy House, up to

22        Larry who kept the minutes.

23   Q.   Anybody in attendance could do that?

24   A.   Yes.
```

```
 1   Q.   It was up to Mr. LeBlanc to appoint someone
 2        to take minutes?
 3   A.   Yes.
 4   Q.   Did you have further communications with
 5        Mr. LeBlanc about the marketing meetings?
 6   A.   Only through performance improvement actions
 7        with him.
 8   Q.   What's a performance improvement action?
 9   A.   It's paperwork or warnings given for
10        non-compliance.
11   Q.   Whose idea was it to give Mr. LeBlanc a
12        warning for non-compliance?
13   A.   It was a general consensus between Mr. Reis
14        and myself.
15   Q.   What conversation did you have with Mr. Reis
16        leading to this general consensus?
17   A.   I said it to Mr. Reis, that he was non-
18        compliant with my request to follow through
19        with marketing meetings.
20   Q.   How did you know he was non-compliant?
21   A.   Because when I asked for minutes, he was
22        unable to provide them.
23   Q.   When you asked him for minutes, what was his
24        response?
```

```
 1   A.   I don't recall.

 2   Q.   You don't remember if he said, "There are no

 3        minutes because there was no meeting," or

 4        "Mr. X or Miss X took the minutes, and I

 5        will try to get them from him"?  You don't

 6        know what he said?

 7   A.   At this point in time I don't recall.

 8   Q.   So you told Mr. Reis that you hadn't got the

 9        minutes for the meetings?

10   A.   Correct.

11   Q.   What month was that?

12   A.   I don't recall.

13   Q.   What did Mr. Reis say?

14   A.   I don't recall the conversation.

15   Q.   Was there anything else that Mr. LeBlanc was

16        given a warning for?

17   A.   He was.  I would probably need to see the

18        documents to be sure on what it was.

19   Q.   Who determined the substance of the warning?

20   A.   I wrote the warnings.

21   Q.   Did you consult with Mr. Reis about that?

22   A.   Correct.

23   Q.   Mr. Reis told you to give Mr. LeBlanc the

24        warning?
```

```
1          until then?
2    A.    I believe it was lower.
3    Q.    What reason did Mr. Reis give, if any, for
4          wanting to lower the staffing level?
5    A.    The census in the building was low, and the
6          requirement or the expectation is that you
7          staff your building to your census level.
8    Q.    Now it says on the bottom, the next
9          paragraph says, "A written warning was
10         given on 6-16."  Was that what you were
11         referring to as the first warning given
12         to Mr. LeBlanc?
13   A.    I believe that was the first warning, yes.
14   Q.    So that notation refers then to holding the
15         marketing meetings that you testified to
16         about already.  And openly questioning his
17         willingness to continue as the
18         administrator, what does that refer to?
19   A.    On several occasions Larry LeBlanc had made
20         comments about whether or not he was the
21         appropriate person for the job.
22   Q.    Who did he make those comments to?
23   A.    In my presence.
24   Q.    What did he say more specifically?
```

| 1 | A. | "I'm not sure if I am the appropriate person |
| 2 | | for the job." |
| 3 | Q. | Did he say why he thought that or what the |
| 4 | | problems were in his mind? |
| 5 | A. | No, I don't recall. |
| 6 | Q. | Did you ask him what made him think that or |
| 7 | | question it? |
| 8 | A. | I don't want to put words into Mr. LeBlanc's |
| 9 | | mouth.  I can't remember exact quotes. |
| 10 | Q. | I understand that.  But did you question him |
| 11 | | to see why he felt that way? |
| 12 | A. | Yeah.  I spoke to him about it. |
| 13 | Q. | So what did he say?  What did he say was the |
| 14 | | reason for him saying that? |
| 15 | | MR. KERMAN:  Objection.  You can |
| 16 | | answer as best you can. |
| 17 | | THE WITNESS:  Okay. |
| 18 | A. | I think Larry hadn't necessarily worked for |
| 19 | | a corporation, and had worked in smaller |
| 20 | | chains, and was not comfortable in this |
| 21 | | different structure and this different -- |
| 22 | | the oversight I think was different at this |
| 23 | | level than it was in his previous |
| 24 | | employment. |

1    Q.    Is that what he said, or is that what you're

2          inferring from circumstances?

3    A.    As I said earlier, I didn't want to put

4          words in his mouth.

5    Q.    Right.

6    A.    But that is what I infer, that is my

7          recollection of it.

8    Q.    What reporting responsibilities or other

9          things, obstacles, did he have placed in his

10         way because he was now with a big

11         corporation?

12                  MR. KERMAN:   Objection.

13   A.    I think Larry was -- he was not used to the

14         oversight.

15   Q.    Why did you put down then in the warning of

16         6-16 that this issue about questioning his

17         willingness to continue as the

18         administrator?  Why would you give him a

19         warning for questioning his own -- being

20         candid and questioning his -- whether he's

21         the right person for the job?

22   A.    I would have to see that warning.

23   Q.    Now let's go up to the top section now where

24         it says 6-3.  "During the meeting with the

```
 1        assistant director of operations and area

 2        administrator the employee was requested to

 3        complete a Wage Survey."  Did Mr. LeBlanc

 4        ever complete this Wage Survey?

 5   A.   No.

 6   Q.   Did you have a conversation with him as to

 7        why he didn't?

 8   A.   Yes.

 9   Q.   When was that, before or after 7-15?

10   A.   I had several conversations with him about

11        completing the Wage Survey.

12   Q.   What did he say?

13   A.   He felt that it was useless, I believe was

14        his words.

15   Q.   Why did he say it was useless?

16   A.   He stated that he had done a Wage Survey

17        approximately eight months prior, presented

18        it to Gilbert Reis, and that Gilbert then

19        went in and adjusted wages the way Gilbert

20        felt they should be adjusted, not

21        necessarily the way Larry wanted them

22        adjusted.

23   Q.   How did Larry say he wanted them adjusted

24        eight months ago prior?
```

| | | |
|---|---|---|
| 1 | A. | I don't know because I wasn't present during |
| 2 | | that conversation with Gilbert. |
| 3 | Q. | Did you ask him what he had meant? |
| 4 | A. | Larry had asked for a larger increase than |
| 5 | | Gilbert approved. |
| 6 | Q. | So when Mr. LeBlanc said it was useless |
| 7 | | because Mr. Reis wouldn't approve the wages |
| 8 | | high enough to be competitive, what did you |
| 9 | | say to him? |
| 10 | | MR. KERMAN:   Objection. |
| 11 | A. | I explained to Larry that it was necessary |
| 12 | | to complete wage surveys on a regular basis, |
| 13 | | to monitor the competition in the area, to |
| 14 | | make sure we were staying competitive, and |
| 15 | | that eight months had passed since his last |
| 16 | | survey was completed, and that it would be |
| 17 | | valuable information if we were going to |
| 18 | | look for increases for his nursing staff, |
| 19 | | that we must know what his competition was |
| 20 | | paying. |
| 21 | Q. | And it was up to Mr. Reis to set the wage |
| 22 | | levels for the nurses? |
| 23 | A. | I don't know who had final say. |
| 24 | Q. | Did Mr. LeBlanc ever complete this Wage |

```
1         Survey?

2    A.   No.

3    Q.   How do you know that?

4    A.   Because I asked for it, and he never was

5         able to provide it to me.

6    Q.   Well, when he told you he thought it was

7         useless, you told him he should do it

8         anyway?

9    A.   That's correct.

10   Q.   Did you have a second conversation with him

11        about the Wage Survey?

12   A.   I had a number of conversations with him

13        about the Wage Survey.

14   Q.   What did you say to him, "Where's your Wage

15        Survey?  We told you you have to do this

16        even if you thought it was useless"?

17   A.   That's pretty close to probably what was

18        said, yes.

19   Q.   What was his response?

20   A.   The same response, that he felt that it was

21        useless, and there was no need to do it.

22   Q.   What did you tell him in response to that?

23   A.   I told him that if we wanted to increase the

24        wages of his nursing staff in his building
```

```
 1           to help recruitment and retention of nurses,

 2           that we needed to know what the competition

 3           was paying, and the only way to do that is

 4           to do a Wage Survey.

 5      Q.   Is this Wage Survey something that was

 6           supposed to be in writing or something that

 7           could be phoned in?

 8      A.   Something that needed to be in writing.

 9      Q.   And presented to whom?

10      A.   To myself.

11      Q.   It says also in here that "The employee was

12           requested to contact sister facility's MMQ

13           nurse for assistance auditing charts."  What

14           does that mean?

15      A.   The MMQ score -- could you clarify your

16           question, please?

17      Q.   Look at the second paragraph where it says

18           right here, "The employee is requested to

19           contact sister facility's MMQ nurse for

20           assistance auditing charts."  This isn't all

21           in proper English, but we can understand

22           what you meant even though there's a mistake

23           or two.  What exactly did you mean there?

24      A.   I had asked Larry, Gilbert and I had asked
```

```
 1            Larry to contact the MMQ nurse at Nichols
 2            House Nursing Home in Fairhaven to speak
 3            with that nurse or to speak with that
 4            administrator, excuse me, over at Nichols
 5            House to find if we could have that nurse
 6            come to Embassy House to do an audit of
 7            charts to make sure that we were capturing
 8            all of the MMQ minutes that we should on the
 9            Embassy patients to justify our billing to
10            the State of Massachusetts.
11     Q.     What's an MMQ nurse?
12     A.     An MMQ nurse is a nurse that -- with Kindred
13            is a nurse that reviews charts and completes
14            the Management Minutes Questionnaire, which
15            is then sent to the State for billing.
16     Q.     So the MMQ nurse does this for all the
17            patients in its facility?
18     A.     Any patient that is a Medicaid patient.
19     Q.     Was there an MMQ nurse at Embassy House?
20     A.     At that time, I do not believe there was.
21     Q.     Was there one at the other nursing home that
22            you were the administrator for?
23     A.     Yes.
24     Q.     Why was there not one at Embassy House?
```

| 1 | A. | It was an open position that hadn't been |
| 2 | | filled. |
| 3 | Q. | For how long had it not been filled? |
| 4 | A. | I do not know. |
| 5 | Q. | What was the name of this -- why did you ask |
| 6 | | for the MMQ nurse in Fairhaven? |
| 7 | A. | That gentleman had assisted in other |
| 8 | | buildings prior, and was thought of very |
| 9 | | highly in terms of his abilities. |
| 10 | Q. | What was his name? |
| 11 | A. | I don't recall. |
| 12 | Q. | Did Mr. LeBlanc do anything to have that MMQ |
| 13 | | nurse come to Embassy House? |
| 14 | A. | Mr. LeBlanc agreed to having this gentleman |
| 15 | | come to the building to assist in auditing. |
| 16 | | Then it's my understanding there was no |
| 17 | | follow-through after that. |
| 18 | Q. | Who told you that? |
| 19 | A. | Through questions that I asked of Larry |
| 20 | | LeBlanc, and at one point I also called |
| 21 | | Nichols House Nursing Home to ask the |
| 22 | | administrator there if permission had been |
| 23 | | asked. |
| 24 | Q. | Did you speak to Mr. -- did you ask |

| | | |
|---|---|---|
| 1 | | Mr. LeBlanc, "How come you didn't get this |
| 2 | | MMQ nurse for Fairhaven over to Embassy |
| 3 | | House like I told you to do it?" |
| 4 | A. | On several occasions. |
| 5 | Q. | What did Mr. LeBlanc say? |
| 6 | A. | Initially, early on, his responses were that |
| 7 | | he just hadn't done it yet. |
| 8 | Q. | But he still intended to do it? |
| 9 | A. | That was my understanding. |
| 10 | Q. | Then what happened? |
| 11 | A. | Later he responded by saying that he did not |
| 12 | | contact the administrator over at Nichols |
| 13 | | House because it was upsetting to his |
| 14 | | director of nurses. |
| 15 | Q. | So he told you that Miss Mallard didn't want |
| 16 | | the MMQ nurse to come in? |
| 17 | A. | That is what he said, yes. |
| 18 | Q. | What did you tell him? |
| 19 | A. | I explained to him that, you know, this was |
| 20 | | something that he needed to do, he needed to |
| 21 | | explain to Kathy the importance of why this |
| 22 | | gentleman was coming and the audit needed to |
| 23 | | take place. |
| 24 | Q. | Did Mr. LeBlanc have the power to order |

```
 1        by the idea of having someone come.
 2   Q.   But you told me before you told him on
 3        July 15th that he was to tell her to do it
 4        anyway?
 5   A.   That's correct.
 6   Q.   Did you ask him whether he had followed up
 7        with Kathy Mallard and relayed to her what
 8        Mr. Reis wanted?
 9   A.   I don't believe I asked if he followed up
10        with Kathy because it was not necessary for
11        him to do that.  He was in charge of the
12        building.  He could have had this person
13        come and audit the charts.
14   Q.   Well, even if the nurses weren't going to
15        cooperate with that person?
16   A.   That would have been his task, he would have
17        had to deal with that issue because they
18        worked for Larry.
19   Q.   How could he have dealt with that issue?
20   A.   I am sure there's hundreds of ways he could
21        have dealt with the issue.
22   Q.   What was he supposed to do if Kathy Mallard
23        refused to cooperate?
24   A.   I don't know.  I don't know if that happened
```

1         or not.

2    Q.   I understand that.  I'm not saying you know.

3         But assuming that it did, what could he have

4         done to alleviate the situation?

5              MR. KERMAN:  Objection.  You can

6         answer.  Give examples of what he could have

7         done to try to convince her.

8    A.   I would have sat with my director of nurses,

9         and I would have discussed the importance on

10        why this person should be coming in to audit

11        these charts, justify with her and explain

12        to her what the benefits of it were.

13   Q.   No, I understand that.  But assuming he told

14        all that to her, and she said to him, "I

15        don't care what you say, we're not doing

16        it," what, if anything, could he have done?

17             MR. KERMAN:  Objection.  You can

18        answer.

19   A.   He could have -- he simply could have said,

20        "This person is coming."

21   Q.   If they said, "We're not going to talk to

22        him, we're going to ignore him," what then

23        could he have done?

24   A.   He would have had to have worked through the

```
 1          disciplinary process with this person as
 2          well, I would assume.
 3    Q.    You're saying he could have disciplined
 4          Miss Mallard?
 5    A.    Yes.
 6    Q.    He had the power to do that also?
 7    A.    Correct.
 8    Q.    And he never reported to you that he had
 9          ever done that?
10    A.    No.
11    Q.    Did you ever ask him whether he had ever
12          done that?
13    A.    No.
14    Q.    Did you discuss with him after July 15th the
15          issue of the marketing meetings?
16    A.    I don't know.
17    Q.    So is it fair to say, then, that Mr. LeBlanc
18          was discharged because of his failure to do
19          the Wage Survey and his failure to get the
20          MMQ nurse into Embassy House?
21    A.    I would need to see that final notice to
22          comment on that.
23    Q.    You don't have any memory of any other
24          reasons why he was fired?
```

56

```
 1        STATE OF MASSACHUSETTS)

 2        COUNTY OF ESSEX)

 3
              I, Joan Applegate, C.S.R., a notary
 4        public in and for the County of Essex and
          State of Massachusetts, do hereby certify
 5        that Jeffrey Govoni was by me first duly
          sworn, to testify to the truth, the whole
 6        truth, and nothing but the truth, and that
          the above deposition, pages 4 through 54,
 7        inclusive, was recorded stenographically by
          me and reduced to typewriting by me.
 8
              I FURTHER CERTIFY that the foregoing
 9        transcript of the said deposition is a true
          and correct transcript of the testimony
10        given by the said witness at the time and
          place specified hereinbefore.
11
              I FURTHER CERTIFY that I am not a
12        relative or employee or attorney or counsel
          of any of the parties, nor a relative or
13        employee of such attorney or counsel, or
          financially interested directly or
14        indirectly in this action.

15            IN WITNESS WHEREOF, I have hereunto
          set my hand and seal of office at Saugus,
16        Massachusetts, this 27th day of September,
          2004.

17

18        _____
                        Joan Applegate
19                Certified Shorthand Reporter
                        Notary Public
20

21
          My notary commission expires:
22        March 29, 2007.

23

24
```

# EXHIBIT K

```
1                              COPY        Pages: 1-38
                                           Exhibits: None
2

3              UNITED STATES DISTRICT COURT

4              DISTRICT OF MASSACHUSETTS

5                         C.A.#: 04-CV-10193RCL

6

7      *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

8      LARRY J. LEBLANC,

9              Plaintiff

10      VS.

11     KINDRED NURSING CENTERS EAST, LLC,

12     d/b/a EMBASSY HOUSE,

13             Defendant

14     *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

15             DEPOSITION OF DONNA KELSEY, a

16     witness called by and on behalf of the

17     Plaintiff, pursuant to the provisions of

18     the Federal Rules of Civil Procedure,

19     before Joan Applegate, a Certified Shorthand

20     Reporter and Notary Public in and for the

21     Commonwealth of Massachusetts, at the Law

22     Offices of Paul Manoff, 47 Winter Street,

23     Boston, Massachusetts, on Friday,

24     September 10, 2004 commencing at 10:00 a.m.
```

```
 1        territory.  It's the same rank within the
 2        company.
 3   Q.   Are you getting increased compensation for
 4        this?
 5   A.   Slightly.
 6   Q.   Slightly.  Your family is moving with you?
 7   A.   Yes, sir.
 8   Q.   Do you have any family members that are
 9        employed by Kindred as well?
10   A.   No.
11   Q.   How long have you been employed by Kindred?
12   A.   11 years.
13   Q.   What's your current position prior to going
14        to Utah?
15   A.   Senior vice-president of the northeast
16        region, health services division, Kindred
17        Healthcare.
18   Q.   What are your duties as senior
19        vice-president?
20   A.   I am responsible for the financial
21        operations and all aspects of 62 nursing
22        centers.
23   Q.   What area do these 62 nursing centers
24        encompass?
```

```
 1   A.   The seven New England States and
 2        Pennsylvania.
 3   Q.   How long have you had this position?
 4   A.   Three years.
 5   Q.   Did Mr. Reis formerly report to you?
 6   A.   Yes.
 7   Q.   What was his position?
 8   A.   He was the director of operations of our
 9        South Shore District.
10   Q.   How many directors of operations reported to
11        you?
12   A.   Five.
13   Q.   He was one of them?
14   A.   Yes.
15   Q.   Did you hire Mr. Reis, or did Mr. Reis work
16        in that position before you were senior
17        vice-president?
18   A.   I hired Mr. Reis.
19   Q.   What made you choose Mr. Reis for the job?
20   A.   He worked for Hillhaven and Vencor in the
21        position of director of operations and was
22        well respected.
23   Q.   Did you know him --
24   A.   Yes.
```

```
 1   A.   I don't remember.

 2   Q.   Did Mr. Reis discuss with you his reasons

 3        for wanting to discharge Mr. LeBlanc?

 4   A.   Generally, yes.

 5   Q.   When did he do that?

 6   A.   I don't know a specific date.

 7   Q.   Well, approximately?

 8   A.   He discussed Mr. LeBlanc's outcomes with me

 9        over a several-month period.

10   Q.   How many discussions did you have with him

11        about Mr. LeBlanc?

12   A.   We discussed the operations of his building

13        on a monthly basis.

14   Q.   Did Mr. Reis ever indicate that he wasn't

15        satisfied with Mr. LeBlanc?

16   A.   Yes.

17   Q.   When did he first do that?

18   A.   I would say as early as -- I'm not sure of

19        the date.

20   Q.   Well, approximately when?

21   A.   I would say the winter of 2003.  We're in

22        2004, it was 2003.

23   Q.   Let me refresh your recollection and

24        indicate that Mr. LeBlanc was discharged one
```

```
 1            year ago in August of 2003.  How much prior
 2            to that discharge did Mr. Reis indicate any
 3            dissatisfaction with Mr. LeBlanc?
 4    A.     At least six months before that.
 5    Q.     What was his dissatisfaction that he
 6            expressed to you of Mr. LeBlanc?
 7    A.     Outcomes, changing the financial outcomes of
 8            the building.
 9    Q.     What does that mean?
10    A.     Our EBITDARM, controlling our labor,
11            controllables, things that administrators
12            have day-to-day control over.
13    Q.     That the nursing home wasn't profitable?
14    A.     Wasn't profitable, and the census was not
15            increasing, it was decreasing.
16    Q.     What did Mr. Reis attribute that to?
17    A.     Operations in the building.
18    Q.     Well, anything more specific than that?
19    A.     He contributed to the leadership, to
20            Mr. LeBlanc's leadership of the building.
21    Q.     Did he say anything more specific as to what
22            was causing the nursing home not to be doing
23            well financially?
24    A.     Here I will tell you that I don't have a
```

```
 1        memory of one specific conversation we've
 2        had.
 3   Q.   I didn't ask you one specific one, I'm
 4        asking you all the conversations lumped
 5        together what he told you about Mr. LeBlanc.
 6   A.   That he did not do as we requested.  I
 7        remember saying, "Have you done everything
 8        you can to make him successful?"  That is
 9        when we had our area administrator position,
10        Jeff come in and try to be of extra
11        assistance with him.  We would have -- we
12        talked about marketing, marketing the
13        building to build the census.  Did he have a
14        marketing plan?  Were they working weekly?
15        Is he doing everything he can within his
16        control to build his census?
17   Q.   The biggest problem then was the number of
18        residents or patients?
19   A.   Residents.
20   Q.   The biggest problem was that there was a
21        relatively low number of residents?
22   A.   That was one of them.  And that, along with
23        what is he doing to change that?
24   Q.   What is the administrator supposed to do, if
```

| | | |
|---|---|---|
| 1 | | anything, to get the census up, as you call |
| 2 | | it? |
| 3 | A. | Have great customer service, market his |
| 4 | | building, have a market plan, find a niche |
| 5 | | that that building wants to go to, go to the |
| 6 | | hospitals, find out what they need to do, |
| 7 | | what kind of residents they're looking to |
| 8 | | discharge. |
| 9 | Q. | How did Mr. LeBlanc's nursing home compete |
| 10 | | with other nursing homes in the area? |
| 11 | | MR. KERMAN:  Objection. |
| 12 | Q. | Were there other nursing homes in the |
| 13 | | Brockton area? |
| 14 | A. | Oh, yes.  There's a lot of facilities in the |
| 15 | | Brockton area.  We did not -- he had a very |
| 16 | | fair budget.  The budget that building has |
| 17 | | is not occupied at 100 percent, and it was |
| 18 | | based on the census that would have been run |
| 19 | | the year before. |
| 20 | Q. | Most of the nursing homes operate at |
| 21 | | 100 percent? |
| 22 | A. | We have the majority at 95, 94 percent. |
| 23 | Q. | What was Mr. LeBlanc's nursing home then? |
| 24 | A. | Around 80 percent. |

```
 1          or what his explanation was?
 2    A.    No.
 3    Q.    Who was supposed to do all these things that
 4          you referred to, do these various meeting
 5          charts?  Was the administrator suppose to do
 6          it, or was he suppose to delegate that
 7          assignment to others?
 8    A.    It depends.  An administrator in the
 9          majority of our buildings make sales calls
10          themselves to the big accounts, and then the
11          department heads pick one, and we usually
12          have an admissions coordinator that does the
13          bulk of them.
14    Q.    What is a big account?
15    A.    A doctor's office with six or seven doctors
16          in it or the Alzheimer's Association.  Go
17          see the discharge planners themselves.
18    Q.    The next thing you mentioned was he was
19          supposed to increase the MMQ scores?
20    A.    Yes.
21    Q.    What does that mean in layman's terms?
22    A.    The MMQ is a measurement of how many nursing
23          minutes a Medicaid patient needs, and the
24          way you determine how much a patient needs
```

```
 1            is basically your documentation, and there's

 2            very precise rules in the State that you can

 3            get money for if the nurses take the time to

 4            write it down.  For example, a tube feeding

 5            -- a person who is tube-fed we are

 6            reimbursed at a higher rate than those who

 7            are not tube-fed because it takes more

 8            nursing care to take care of them.

 9     Q.     Are these nurses that are providing this

10            care?  These are salaried nurses?

11     A.     These are hourly nurses.

12     Q.     These are nurses that are being paid by

13            Kindred?

14     A.     Yes.

15     Q.     Their services are reimbursed by the

16            government, depending upon the nature of the

17            service?

18     A.     Yes.

19     Q.     So you're saying that if the services were

20            better documented, you would get higher

21            reimbursements?

22     A.     Yes.

23     Q.     What exactly was Mr. LeBlanc supposed to do

24            relative to getting these nurses to better
```

```
 1    Q.    The last thing you mentioned was reduce the
 2          contract labor.  What does that mean?
 3    A.    If you don't have enough staff that we pay
 4          and you are short-staffed, you call up the
 5          agency and they will send you a rent-a-
 6          nurse.
 7    Q.    Under what circumstances would you need
 8          these outside workers?
 9    A.    If you don't have your own staff.
10    Q.    Why would you not have your own staff, a
11          sufficient staff?  If people call in sick,
12          or is there some other --
13    A.    If people call in sick, they're not hiring.
14          You don't treat people well and they leave.
15    Q.    So you have openings from time to time?
16    A.    Right, yes.
17    Q.    So what made you think that Mr. LeBlanc had
18          a higher than acceptable amount of contract
19          labor?
20    A.    Any contract labor is not good.
21    Q.    Right.  You want to minimize it, I
22          understand that.
23    A.    Right.
24    Q.    Is there some standard that the nursing
```

```
 1            homes are allowed to have some percentage of

 2            for overall employment expense or anything?

 3            Is there some objective measurement of what

 4            is acceptable and what isn't?

 5    A.    No.  Having any is unacceptable.

 6    Q.    Well, all the nursing homes have some from

 7          time to time?

 8    A.    Yes.

 9    Q.    What made you think that Mr. LeBlanc's

10          nursing home was having more of a problem?

11    A.    Because his numbers were going up and not

12          down.

13    Q.    His numbers of what?

14    A.    Of contract labor hours.

15    Q.    From what period to what period?

16    A.    For the beginning of that, for the year of

17          2003.

18    Q.    It was more than 2002?

19                MR. KERMAN:  Excuse me?

20    A.    2003?

21                MR. KERMAN:  She said 2003.

22    Q.    It was going up in 2003.  I said compared to

23          what, 2002?

24    A.    No, compared month-to-month.  We look at
```

```
 1              each month, and if it goes up or it stays

 2              the same, that is not good.  We want it to

 3              be decreasing month-after-month and have a

 4              plan for it to decrease.

 5       Q.     I take it you never spoke to Mr. LeBlanc

 6              personally about this issue?

 7       A.     No.

 8       Q.     What, if anything, did Mr. Reis tell you

 9              about his discussions with Mr. LeBlanc about

10              this issue?

11       A.     None that I can recall.

12       Q.     Did Mr. LeBlanc have an explanation as to

13              why the contract labor expenses were going

14              up rather than down?

15       A.     I did not speak with Mr. LeBlanc.

16       Q.     Did he have an explanation that Mr. Reis

17              related to you?

18       A.     Not that I recall.

19       Q.     Was there any other -- well, if Mr. Reis was

20              advocating Mr. LeBlanc be terminated in

21              April of that year; 2003, what caused there

22              to be a four-month delay in the process?

23                   MR. KERMAN:  Objection.  You can

24              answer.
```

```
 1           recess.)
 2                    MR. KERMAN:  Just one item to
 3           follow-up, Miss Kelsey.
 4                    E X A M I N A T I O N
 5           BY MR. KERMAN:
 6   Q.    Did Gilbert Reis indicate to you that he had
 7           told Mr. LeBlanc of any ways of reducing
 8           contract labor costs?
 9   A.    Yes.
10   Q.    What did Mr. Reis tell you?
11   A.    He said that Mr. LeBlanc was stating that
12           his wages in the Brockton area were too low.
13           I requested from Mr. Reis, as we do with all
14           our buildings for any kind of wage
15           increases, that a wage survey be done so
16           that I, as a senior vice-president, know
17           that the wages are going to the correct --
18           are competitive or not.  Is there an issue
19           on 3:00 to 11:00, midshift or dayshift,
20           where the issues are.  So I did request
21           that.
22   Q.    And what did Mr. Reis say with regard to
23           Mr. LeBlanc's response to a wage survey?
24   A.    That he did not carry through.
```

```
 1        STATE OF MASSACHUSETTS)

 2        COUNTY OF ESSEX)

 3

 4             I, Joan Applegate, C.S.R., a notary
          public in and for the County of Essex and
          State of Massachusetts, do hereby certify
 5        that Donna Kelsey was by me first duly
          sworn, to testify to the truth, the whole
 6        truth, and nothing but the truth, and that
          the above deposition, pages 4 through 36,
 7        inclusive, was recorded stenographically by
          me and reduced to typewriting by me.
 8
               I FURTHER CERTIFY that the foregoing
 9        transcript of the said deposition is a true
          and correct transcript of the testimony
10        given by the said witness at the time and
          place specified hereinbefore.
11
               I FURTHER CERTIFY that I am not a
12        relative or employee or attorney or counsel
          of any of the parties, nor a relative or
13        employee of such attorney or counsel, or
          financially interested directly or
14        indirectly in this action.

15             IN WITNESS WHEREOF, I have hereunto
          set my hand and seal of office at Saugus,
16        Massachusetts, this 27th day of September,
          2004.

17

18                              _____

19                              Joan Applegate
                                Certified Shorthand Reporter
                                Notary Public
20

21

          My notary commission expires:
22        March 29, 2007.

23

24
```

1     STATE OF MASSACHUSETTS)

2     COUNTY OF ESSEX)

3

4          I, Joan Applegate, C.S.R., a notary
      public in and for the County of Essex and
      State of Massachusetts, do hereby certify
5     that Donna Kelsey was by me first duly
      sworn, to testify to the truth, the whole
6     truth, and nothing but the truth, and that
      the above deposition, pages 4 through 36,
7     inclusive, was recorded stenographically by
      me and reduced to typewriting by me.

8

9          I FURTHER CERTIFY that the foregoing
      transcript of the said deposition is a true
      and correct transcript of the testimony
10    given by the said witness at the time and
      place specified hereinbefore.

11

12         I FURTHER CERTIFY that I am not a
      relative or employee or attorney or counsel
      of any of the parties, nor a relative or
13    employee of such attorney or counsel, or
      financially interested directly or
14    indirectly in this action.

15         IN WITNESS WHEREOF, I have hereunto
      set my hand and seal of office at Saugus,
16    Massachusetts, this 27th day of September,
      2004.

17

18                          _____

19                            Joan Applegate
                          Certified Shorthand Reporter
                              Notary Public
20

21

      My notary commission expires:
22    March 29, 2007.

23

24