UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

*************************************************
LARRY J. LEBLANC,                                *
                                                 *
        Plaintiff                                *
                                                 *
v.                                               *   **C.A. NO. 04-CV-10193RCL**
                                                 *
KINDRED NURSING CENTERS EAST, LLC,               *
d/b/a EMBASSY HOUSE,                             *
                                                 *
        Defendant                                *
*************************************************

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

This is a whistleblower action, arising in the employment context. The plaintiff, a nursing home administrator, alleges that in 2003, after more than 1 year of employment with the defendant company, he was discharged in retaliation for his refusal to engage in illegal practices, and/or his protests of actions which he deemed to be illegal and/or injurious to the public health. The plaintiff's claim arises under G.L. c. 149, Section 187.[1] Defendant has filed a motion for summary judgment, on the grounds that the statute in question does not apply and/or that the evidence does not show that plaintiff was discharged due to actions protected by the statute. The plaintiff opposes this motion. In connection with his opposition to the motion, he relies upon his affidavit, filed herewith.

The facts underlying this claim are referenced in plaintiff's Local Rule 56.1 statement. In summary, plaintiff alleges that upon assuming the duties of nursing home administrator, plaintiff reported to one, Gilbert Reis. Mr. Reis, having terminated plaintiff's predecessor, served as acting administrator for the same nursing home for a few months until plaintiff came on board.

---

[1] Defendant removed the case to this court on the basis of diversity jurisdiction.

Early in plaintiff's tenure, he clashed with Reis over the fact that the nursing home had not done the mandatory CORI (criminal background) checks for its new employees. Reis obstructed plaintiff's efforts to have the outside vendor (under contract with defendant) come in and do the CORI checks. At first, Reis insisted the home was in compliance. When plaintiff investigated and told Reis the home was not in compliance (and this reflected poorly on Reis, who had run the home prior to plaintiff), Reis got visibly angry with plaintiff. Eventually Reis relented and allowed the CORI screenings to be done.

Shortly after, Reis gave plaintiff a written warning, which plaintiff maintained had no factual basis. When plaintiff told Reis that the warning was retaliatory and was linked to their disagreement over the CORI issue, Reis did not deny it, but replied, "so what?"

Under plaintiff's leadership the nursing home improved its financial performance, as well as its occupancy level, and plaintiff devoted substantial effort to keeping costs within budgetary guidelines. Plaintiff received a performance bonus in March, 2003 because his home was in line with its financial targets.

In the spring of 2003 (following the receipt of the bonus), plaintiff and Reis had a substantial clash over Reis' edict that the nursing home take some of its beds out of circulation. These beds were ones that were utilized from time to time. Plaintiff protested Reis' edict, telling Reis that according to state regulations (with which plaintiff was familiar) the home needed state approval to take the beds out of circulation. Reis responded by telling plaintiff to "fuck the state," and to do what he, Reis, said. Reis told plaintiff he had done it before at other homes (and presumably gotten away with it). When plaintiff protested, Reis became threatening and intimidating to plaintiff until plaintiff finally followed the illegal order and took out the beds. State officials came to the nursing home some time in the spring of 2003 and cited the abandonment of the beds as a violation, and ordered the nursing home to reinstate the beds.

Reis and plaintiff clashed on other issues involving actions which plaintiff considered to be illegal or inimical to the public health. These included, <u>inter alia</u>, Reis' insistence that young homeless persons be housed at the nursing home despite plaintiff's protests that this presented a danger to an elderly and infirm population of residents, defendant's insistence that plaintiff verify cost reports presented to medicaid and/or medicare, where plaintiff was not allowed to see the underlying cost reports which he was charged with verifying and Reis' insistence that plaintiff convert space in the home to a different use and that plaintiff was not allowed to contact the state to see if state approval was necessary for the conversion.

Shortly after the contentious disagreement between Reis and LeBlanc, relative to taking the beds out of circulation, Reis commenced a campaign to drive plaintiff out of the company. Reis assigned another home administrator, one Jeffrey Govoni, to oversee plaintiff, and had Govoni give plaintiff a series of warnings which made no sense. Govoni, himself, told plaintiff that he, Govoni, was only doing Reis' dirty work and that contrary to appearances, he, Govoni, thought plaintiff was doing a good job.

Plaintiff was written up in the summer of 2003 by Govoni/Reis for several nonsensical things, e.g. failing to conduct marketing meetings, which plaintiff in fact conducted, failing to do a wage survey, when in fact plaintiff had done numerous wage surveys which were ignored by Reis and failing to have a MMQ nurse from outside come into the home and educate the nursing staff there, as when the home's director of nurses refused to cooperate with the outside nurse, Reis knew that, but refused to take any action disciplining the director of nurses. Moreover, some of these assignments given to plaintiff, were allegedly to be done at times when plaintiff was on vacation.

Plaintiff was discharged in August, ostensibly for his failure to comply with the nonsensical Govoni/Reis edicts.

## Argument

Defendant first argues that the protections of the health care workers whistleblower act, G.L. c. 149 § 187, do not apply to plaintiff because the practices plaintiff complained of did not pose a risk to public health.

On the contrary, plaintiff asserts that the main issues of dispute between plaintiff and Reis, the failure to do CORI checks, which led to the first warning (fall of 2002) and the taking of beds out of circulation without state approval, which led to Reis' calculated effort to discharge plaintiff (spring of 2003), are both practices which posed a risk to public health. The statute in question refers to "public health" and not the health of a particular patient. Employing in nursing homes, persons with dangerous criminal backgrounds, certainly poses a risk to "public health" as that term is understood. The same with taking beds out of circulation. The requirement that beds not be taken out of circulation (without approval) is a public health issue, namely the state's attempt to make sure that sufficient beds are available in case of rising need for nursing home beds. After all, public health, by definition, concerns the health needs of the population as a whole. Of course, taking beds out of circulation, could impact or jeopardize the health of some elderly or disabled persons, in the event of a shortage of nursing home beds, some needy individual could be deprived of one.[2]

Defendant next argues that because Kindred (Reis) started disciplining plaintiff before he raised most of his concerns, there is no causal nexus between the concerns and his discharge. First of all, the November warning to which defendant refers (page 9 of its memorandum) was issued (admittedly) by Reis in retaliation for plaintiff's efforts to get the nursing home to do the required CORI background checks. So it is not true that here, discipline was imposed before any

---

[2] Even if the court rules that G.L. c. 149 § 187 does not apply to plaintiff, plaintiff may pursue (listed in the complaint as an alternate theory of recovery) a discharge in violation of the public policy of the Commonwealth. See Wright v. Shriners Hospital for Crippled Children, 412 Mass. 469 (1992).

protected activity. Moreover, after plaintiff and Reis clashed in the spring of 2003 over taking the beds out of circulation, Reis began his campaign (after taking no action against plaintiff for 6-7 months and allowing plaintiff to receive a bonus) to drive plaintiff out of the company.

Defendant next argues (pages 10-11) that with respect to the CORI issue, plaintiff did not object to or refuse to participate in any activity. Plaintiff, did, however, insist that the nursing home (over Reis' objection), engage in conduct which it was legally mandated to perform. Defendant overlooks, though, G.L. c. 149 § 187 (b)(1), which gives protection to a health care worker who discloses to a manager, a practice which the health care worker believes is in violation of law or regulation or provides a risk to public health. Plaintiff's insistence that the nursing home perform the required CORI checks is a protected activity under § 187(b)(1).[3]

Defendant next argues that it has articulated a non-retaliatory reason (or reasons) for discharging plaintiff (conceded by plaintiff) and that there is insufficient evidence of pretext. Plaintiff asserts there is ample evidence of pretext, including, Reis' statement of "so what," after plaintiff said his actions were retaliatory, Reis' sending Govoni to oversee plaintiff right after the blowup relative to the beds being taken out of circulation, Reis telling plaintiff "fuck the state," when plaintiff sought state approval, Govoni admitting he was doing Reis' dirty work and that he thought plaintiff performed well, that plaintiff did do the marketing meetings as requested, that he did numerous wage surveys which Reis ignored, that Ms. Mallard, not plaintiff, obstructed the efforts to bring in the MMQ nurse and Reis took no action against Mallard, and that some of these assignments were given to plaintiff during a time he was on vacation.

---

[3] The deposition testimony, cited by defendant does not contradict plaintiff's assertions, pages 86-87 do not show that Reis discovered the problem, plaintiff brought it to Reis' attention. Reis at first said fix it, but then later obstructed plaintiff when he sought to bring in the outside vendor. LeBlanc did testify that once the outside vendor did come in, Reis did not interfere with the vendor, but nowhere did LeBlanc testify that Reis did not interfere with his efforts to bring in the vendor.

## CONCLUSION

For the foregoing reasons, the plaintiff asks that defendants' motion be denied and that this case go forward on the claim against defendants.

Date: _____

Larry J. LeBlanc
By his attorney,

_____
Paul A. Manoff
47 Winter Street, 4th Floor
Boston, MA 02108
(617) 542-4620
BBO# 318220

## CERTIFICATE OF SERVICE

I, Paul A. Manoff, hereby certify that on December 23, 2004 I served a copy of the above document on the defendant by mailing a copy, first class, postage prepaid to David Kerman, Jackson, Lewis, LLP, 75 Park Plaza, Boston, MA 02116.

_____
Paul A. Manoff

leblanc\opsumjud