UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

LARRY J. LEBLANC,

    Plaintiff

v.                       **C.A. NO. 04-CV-10193RCL**

KINDRED NURSING CENTERS EAST, LLC,
d/b/a EMBASSY HOUSE,

    Defendant

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS
IN SUPPORT OF HIS CONTENTION THAT THERE IS A
GENUINE ISSUE TO BE TRIED**

Pursuant to Local Rule 56.1, plaintiff submits the following additional material facts in support of his contention that there is a genuine issue to be tried.

I. Rebuttal of Defendant's Statement of Facts[1]

3. Prior to November 1, 2002, plaintiff told Mr. Reis that the nursing home was totally out of compliance with state law because it had not done required CORI checks (criminal background investigations) for all new employees. Mr. Reis interfered with and obstructed plaintiff's efforts to get the mandated CORI checks done. Reis told LeBlanc that he didn't want plaintiff to bring in the 3rd party vendor who had a contract with Kindred to do the CORI checks for the nursing home. Reis insisted that the mandated CORI checks had been done. Plaintiff told him that his investigation showed they had not been done and LeBlanc asked Reis (he was LeBlanc's predecessor as administrator of the nursing home) how he let the situation get so out of compliance. Reis got visibly angry with plaintiff. Eventually, Reis relented and allowed the CORI checks to be done. When plaintiff received the November disciplinary notice, he believed that it was retaliatory and issued in bad faith, because he had not done anything which Reis had

---

[1] These paragraph numbers parallel the paragraph numbers used by defendants in their statement.

accused him of and because Reis was visibly angry at LeBlanc when plaintiff suggested that Reis had let the nursing home become out of compliance with the government regulations. Plaintiff approached Reis when he received the November notice and told him that he thought the notice was issued in retaliation for his complaints relative to the CORI situation. Reis did not deny he issued the notice due to retaliation, but only responded by saying "so what" (LeBlanc affidavit, paragraph 2).

4. Plaintiff did review on a weekly basis the home's outstanding accounts receivables, and he did succeed in substantially increasing collections. Also, plaintiff did conduct monthly staff meetings with his direct reports to address quality assurance issues. Accordingly, there is no factual basis for the criticisms stated at this paragraph (LeBlanc affidavit, paragraph 3).

5-6. The financial performance of plaintiff's nursing home improved during 2003. During his tenure he raised the home's occupancy from 98 to 112 by April of 2003. He did control labor costs and they were in line with the budget he was given by defendant. His home's occupancy rate was well over 90%, not the 80% cited here by defendant. It is not true that the revenue was lower than forecasted and the center's expenses were higher, rather LeBlanc's home was in line with projections, and he received a performance bonus in March, 2003 because his home was in line with projections (LeBlanc affidavit, paragraph 4).

7. When Mr. Govoni presented his mandates to plaintiff in the spring of 2003, Govoni told plaintiff that he was there to do Reis' dirty work, that he thought plaintiff was doing an outstanding job, and he did not understand why he was being asked to oversee plaintiff. LeBlanc was doing weekly marketing meetings even before Govoni mentioned the issue and plaintiff told Govoni that he was doing so. LeBlanc never refused to conduct such meetings, was never asked for documentations of them, and such documentation existed, if anyone was really interested in seeing it (LeBlanc affidavit, paragraph 5).

8. Plaintiff never expressed doubts to Govoni about whether he was the right person to be the administrator. On the contrary, it was Govoni who expressed doubts as to whether he should hold his position (LeBlanc affidavit, paragraph 6).

9. The warning had no basis in fact as plaintiff was continuing to hold the meetings in question. He did send the minutes to Mr. Govoni as instructed (LeBlanc affidavit, paragraph 7).

10. Expenditures for contract labor did not increase during LeBlanc's tenure, but were at a high level before he became administrator. They continued to be high because of low entry level wages paid by Kindred to its new employees. Plaintiff did several wage surveys which he provided to Mr. Reis, as well as a survey by the Massachusetts Extended Care Federation. Mr. Reis ignored all the surveys plaintiff gave him, never acted on them and he never made any adjustments to entry level wages as plaintiff requested he do (LeBlanc affidavit, paragraph 8).

11. Mr. Govoni did not tell plaintiff in June, 2003 that he needed to do another survey. LeBlanc had done a wage survey as recently as April, 2003 (not 8 months earlier), which Reis kept from his superiors. Govoni never told plaintiff that substantial time had elapsed since the center's last survey (LeBlanc affidavit, paragraph 9).

13. Plaintiff's center did have an experienced MMQ nurse, capable of overseeing the MMQ scores, namely, Catherine Mallard, Director of Nurses. Plaintiff did not refuse to follow this directive, he called the other facility and the MMQ nurse was not immediately available. At some later point Ms. Mallard refused to cooperate and would not allow the MMQ nurse from the other facility to come in and work with her. She indicated her refusal at a meeting in which Mr. Reis, Mr. Govoni and plaintiff were all present. Reis did not respond to Mallard, and left the situation unresolved. Plaintiff was never given a directive to directly order Ms. Mallard to cooperate (LeBlanc affidavit, paragraph 10).

14. Plaintiff did receive this warning but questioned Govoni as to why he was receiving it, when he was in compliance with his directives, Govoni, repeated what he had previously said, that he was just doing "Reis' dirty work," and there was no discussion of the specifics of the warnings. Govoni also indicated that he thought Reis was being unfair to plaintiff. As for the June 17, 2003 meeting, plaintiff was on his way to the meeting when his car broke down. He promptly went to a pay phone and called into the business office manager and to the office where the meeting was held to let everyone know he would be delayed. The deadline for doing another wage survey by July 29 was ridiculous as Reis and Govoni both knew plaintiff was on vacation for 2 weeks at the end of July and early August (LeBlanc affidavit, paragraph 11).

15. Plaintiff was on vacation during this period and it was ridiculous to give him such deadlines. Mr. Reis could have ordered Mr. Mallard to cooperate with the MMQ nurse from the other facility at any time. LeBlanc did not have the power to discharge Ms. Mallard, but Mr. Reis did. Mr. Reis never directed plaintiff to discipline her in any way. As for the wage surveys, plaintiff had given several to Mr. Reis who ignored them, it made no sense that plaintiff would be fired for not doing another (LeBlanc affidavit, paragraph 12).

17. Reis only very reluctantly allowed plaintiff to bring in the outside vendor to do the criminal background checks, he at first became very angry with plaintiff when he pressed the issue. Reis only did not prevent or interfere with LeBlanc's efforts in this regard, once the vendor was brought in. Before the vendor was called in, Reis was hostile to plaintiff's efforts to obtain compliance (LeBlanc affidavit, paragraph 13).

18. Plaintiff was not aware of any procedures or safeguards which the reimbursement department had that were designed to insure the accuracy of information incorporated into the cost reports (LeBlanc affidavit, paragraph 14).

19. Plaintiff declined to sign the cost report verifications because he was not allowed access to the cost report so he could not verify its accuracy, which he was being requested to do. He suspected that the reports might be inaccurate because Reis had ordered various rehab personnel working at other nursing homes to be paid out of plaintiff's home's payroll, even though those employees did not work at his nursing home. When plaintiff initially told Reis why he didn't want to sign the verifications, he ordered LeBlanc to do so in a threatening and hostile manner (LeBlanc affidavit, paragraph 15).

20. No one from the Reimbursement Department ever explained to plaintiff that the form was not requesting him to verify the accuracy of the report, but was rather only verifying that his center's ledger was accurate. Moreover, the form, itself, indicated that he was verifying the accuracy of the report (LeBlanc affidavit, paragraph 16).

21. Plaintiff could not tell if the cost reports were accurate without seeing the cost reports. He suspected, after a while, that the reports were inaccurate, but he could never verify his suspicions because he never got to see the underlying reports. Heidi Mason, who maintained the ledger, was not supervised by plaintiff, but by Betsy Pimental, a corporate official (LeBlanc affidavit, paragraph 17).

22. The center's resident census was not well below capacity and the beds in question that Reis wanted to abandon were in fact used from time to time. Plaintiff strongly felt that they needed state approval (it was contained in state regulations which plaintiff was familiar with) to abandon the beds. When plaintiff was told by Reis that the home needed state approval, Reis told LeBlanc, "fuck the state," and to do what he said. He said that he had done it (abandoned beds without state approval) in other nursing homes. He became threatening and intimidating to LeBlanc, until plaintiff followed his illegal order and took out the beds. Reis said to plaintiff, I don't care what the rules say, just do it. Plaintiff delayed implementing his order, but did so,

after he threatened plaintiff. State officials came to the facility in the spring of 2003 and cited the abandonment of the beds as a violation. The state ordered the home to reinstate the beds (LeBlanc affidavit, paragraph 18).

24. Plaintiff suggested to Reis that they make inquiry of the state as to whether their approval was necessary (plaintiff wasn't sure, but he did not want to run the risk of being cited again by the state). Reis responded by telling plaintiff to "do it" and that he should not make any inquiries of the state (LeBlanc affidavit, paragraph 19).

## II. Additional Material Facts

1. Mr. Reis and plaintiff had ongoing disagreements about admitting patients who posed a danger to others. Reis had ordered the home to admit young homeless patients with medical complications, into a facility with an elderly infirm population. LeBlanc constantly told him that he was endangering the elderly patients but he overrode plaintiff's objections and ordered the home to take anyone who could fill the beds. This was a constant source of disagreement between Reis and LeBlanc. There were some incidents of older patients being assaulted by these younger, homeless patients (LeBlanc affidavit, paragraph 20).

Larry J. LeBlanc
By his attorney,

Date: _____

Paul A. Manoff
47 Winter Street, 4th Floor
Boston, MA 02108
(617) 542-4620
BBO# 318220

## CERTIFICATE OF SERVICE

    I, Paul A. Manoff, hereby certify that on December 23, 2004 I served a copy of the above document on the defendant by mailing a copy, first class, postage prepaid to David Kerman, Jackson, Lewis, LLP, 75 Park Plaza, Boston, MA 02116.

                                                                Paul A. Manoff

leblanc\statfact