UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| LARRY J. LEBLANC, | \* |
| | \* |
| Plaintiff | \* |
| | \* |
| v. | \* C.A. NO. 04-CV-10193RCL |
| | \* |
| KINDRED NURSING CENTERS EAST, LLC, | \* |
| d/b/a EMBASSY HOUSE, | \* |
| | \* |
| | \* |
| Defendant | \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## AFFIDAVIT OF LARRY J. LEBLANC

I, Larry J. LeBlanc, hereby depose and say as follows:

1. I am the plaintiff in the above action.

2. Prior to November 1, 2002, I told Mr. Reis that the nursing home was totally out of compliance with state law because we had not done CORI checks (criminal background investigations) for all new employees. Mr. Reis interfered with and obstructed my efforts to get the mandated CORI checks done. He told me that he didn't want me to bring in the 3rd party vendor who had a contract with Kindred to do the CORI checks for my nursing home. Reis insisted that the mandated CORI checks had been done. I told him that my investigation showed they had not been done and I asked him (he was my predecessor as administrator of the nursing home) how he let the situation get so out of compliance. He got visibly angry with me. Eventually, he relented and allowed the CORI checks to be done. When I received the November disciplinary notice, I believed that it was retaliatory and issued in bad faith, because I had not done anything which he accused me of and because he was visibly angry at me when I suggested that he had let the nursing home become out of compliance with the government regulations. I approached Mr. Reis when I received the November notice and told him that I

thought the notice was issued in retaliation for my complaints relative to the CORI situation. Reis did not deny he issued the notice due to retaliation, but only responded by saying "so what."

3. I did review on a weekly basis the home's outstanding accounts receivables, and I did succeed in substantially increasing collections. Also, I did conduct monthly staff meetings with my direct reports to address quality assurance issues. Accordingly, there is no factual basis for these criticisms.

4. The financial performance of my nursing home improved during 2003. During my tenure I raised the home's occupancy rate from 98 to 112 by April of 2003. I did control labor costs and they were in line with the budget I was given by defendant. My home's occupancy rate was well over 90%, not the 80% cited here by defendant. It is not true that the revenue was lower than forecasted and the center's expenses were higher, rather my home was in line with projections, and I received a performance bonus in March, 2003 because my home was in line with projections.

5. When Mr. Govoni presented his mandates to me in the spring of 2003, he told me that he was there to do Reis' dirty work, that he thought I was doing an outstanding job, and he did not understand why he was being asked to oversee me. I was doing weekly marketing meetings even before Govoni mentioned the issue and told him that I was doing so. I never refused to conduct such meetings, was never asked for documentations of them, and such documentation existed, if anyone was really interested in seeing it.

6. I never expressed doubts to Govoni about whether I was the right person to be the administrator. On the contrary, it was Govoni who expressed doubts as to whether he should hold his position.

7. The warning had no basis in fact as I was continuing to hold the meetings in question. I did send the minutes to Mr. Govoni as instructed.

8. Expenditures for contract labor did not increase during my tenure, but were at a high level before I became administrator. They continued to be high because of low entry level wages paid by Kindred to its new employees. I did several wage surveys which I provided to Mr. Reis, as well as a survey by the Massachusetts Extended Care Federation. Mr. Reis ignored all the surveys I gave him, never acted on them and he never made any adjustments to entry level wages as I requested he do.

9. Mr. Govoni did not tell me in June, 2003 that I needed to do another survey. I had done a wage survey as recently as April, 2003 (not 8 months earlier), which Reis kept from his superiors. Govoni never told me that substantial time had elapsed since the center's last survey.

10. My center did have an experienced MMQ nurse, capable of overseeing the MMQ scores, namely, Catherine Mallard, Director of Nurses. I did not refuse to follow this directive, I called the other facility and the MMQ nurse was not immediately available. At some later point Ms. Mallard refused to cooperate and would not allow the MMQ nurse from the other facility to come in and work with her. She indicated her refusal at a meeting in which Mr. Reis, Mr. Govoni and I were all present. Reis did not respond to Mallard, and left the situation unresolved. I was never given an order to directly order Ms. Mallard to cooperate.

11. I did receive this warning but questioned Govoni as to why I was receiving it, when I was in compliance with my directives, Govoni, repeated what he had previously said, that he was just doing "Reis' dirty work," and there was no discussion of the specifics of the warnings. Govoni also indicated that he thought Reis was being unfair to me. As for the June 17, 2003 meeting, I was on my way to the meeting when my car broke down. I promptly went to a pay

phone and called into the business office manager and to the office where the meeting was held to let everyone know I would be delayed. The deadline for doing another wage survey by July 29 was ridiculous as Reis and Govoni both knew I was on vacation for 2 weeks at the end of July and early August.

12. I was on vacation during this period and it was ridiculous to give me such deadlines. Mr. Reis could have ordered Mr. Mallard to cooperate with the MMQ nurse from the other facility at any time. I did not have the power to discharge Ms. Mallard, but Mr. Reis did. Mr. Reis never directed me to discipline her in any way. As for the wage surveys, I had given several to Mr. Reis who ignored them, it made no sense that I would be fired for not doing another.

13. Reis only very reluctantly allowed me to bring in the outside vender to do the criminal background checks, he at first became very angry with me when I pressed the issue. Reis only did not prevent or interfere with my efforts in this regard, once the vendor was brought in. Before the vendor was called in, Reis was hostile to my efforts to obtain compliance.

14. I was not aware of any procedures or safeguards which the reimbursement department had that were designed to insure the accuracy of information incorporated into the cost reports.

15. I declined to sign the cost report verifications because I was not allowed access to the cost report so I could not verify its accuracy, which I was being requested to do. I suspected that the reports might be inaccurate because Reis had ordered various rehab personnel working at other nursing homes to be paid out of our payroll, even though those employees did not work at my home. When I initially told Reis why I didn't want to sign the verifications, he ordered me to do so in a threatening and hostile manner.

-5-

16. No one from the Reimbursement Department ever explained to me that the form was not requesting me to verify the accuracy of the report, but was rather only verifying that my center's ledger was accurate. Moreover, the form, itself, indicated that I was verifying the accuracy of the report.

17. I could not tell if the cost reports were accurate without seeing the cost reports. I suspected, after a while, that the reports were inaccurate, but I could never verify my suspicions because I never got to see the underlying reports. Heidi Mason, who maintained the ledger, was not supervised by me, but by Betsy Pimental, a corporate official.

18. The center's resident census was not well below capacity and the beds in question that Reis wanted to abandon were in fact used from time to time. I strongly felt that he needed state approval (it was contained in state regulations which I was familiar with) to abandon the beds. When I was told Reis that we needed state approval, he told me, "fuck the state," and to do what he said. He said that he had done it (abandoned beds without state approval) in other nursing homes. He became threatening and intimidating to me, until I followed his illegal order and took out the beds. Reis said to me, I don't care what the rules say, just do it. I delayed implementing his order, but did so, after he threatened me. State officials came to the facility in the spring of 2003 and cited the abandonment of the beds as a violation. The state ordered us to reinstate the beds.

19. I suggested to Reis that we make inquiry of the state whether their approval was necessary (I wasn't sure, but I did not want to run the risk of being cited again by the state). Reis responded by telling me to "do it" and that I should not make any inquiries of the state.

20. Mr. Reis and I had ongoing disagreements about admitting patients who posed a danger to others. Reis had ordered us to admit young homeless patients with medical complications, into a facility with an elderly infirm population. I constantly told him that he was endangering the elderly patients but he overrode my objections and ordered us to take anyone who could fill the beds. This was a constant source of disagreement between Reis and myself. There were some incidents of older patients being assaulted by these younger, homeless patients.

Signed under the pains and penalties of perjury this _____ day of December, 2004.

leblanc\affleblanc

Larry J. LeBlanc