UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LARRY J. LEBLANC,

        Plaintiff

v.

KINDRED NURSING CENTERS EAST, LLC
d/b/a EMBASSY HOUSE,

        Defendant

Civil Action No. 04-CV-10193 RCL

## SUPPLEMENTAL DECLARATION OF DAVID J. KERMAN

David J. Kerman, on oath, deposes and says as follows:

1.     I am a partner with the firm Jackson Lewis LLP, counsel for Defendant in the above-captioned matter. I have been involved in the defense of this litigation on behalf of Kindred Nursing Centers East, LLC d/b/a Embassy House ("Kindred").

2.     I took the first day of the deposition of Plaintiff Larry Leblanc on or about March 31, 2004. True and accurate photocopies of excerpts from that deposition transcript that were not previously submitted in support of Defendant's motion for summary judgment are attached as Exhibit A.

3.     I took the second day of Plaintiff's deposition on or about June 16, 2004. True and accurate photocopies of excerpts from that deposition transcript that were not previously submitted in support of Defendant's motion for summary judgment are attached as Exhibit B.

4.     On or about August 5, 2004, Plaintiff's counsel took the deposition of Gilbert Reis. True and accurate photocopies of excerpts of his deposition that were not previously submitted in support of Defendant's motion for summary judgment are attached as Exhibit C.

Signed under the pains and penalties of perjury this 27th day of January, 2005.

David J. Kerman

# EXHIBIT A

1

Volume I
Pages 1 - 201
Exhibits 1 to 4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - x
                                  :
LARRY J. LEBLANC,                 :
          Plaintiff,              :
                                  :
          vs.                     : Civil Action No.
                                  : 04-CV-10193RCL
KINDRED NURSING CENTERS EAST,     :
LLC, d/b/a EMBASSY HOUSE,         :
          Defendant.              :
                                  :
- - - - - - - - - - - - - - - - - x

          DEPOSITION OF LARRY J. LeBLANC, a witness
called on behalf of the Defendant, taken pursuant to
the Federal Rules of Civil Procedure, before Daniel
P. Wolfe, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Jackson Lewis LLP,
75 Park Plaza, Boston, Massachusetts, on Wednesday,
March 31, 2004, commencing at 10:15 a.m.

PRESENT:

    Law Office of Paul A. Manoff
        (by Paul A. Manoff, Esq.)
        47 Winter Street, 4th Floor, Boston, MA
        02108, for the Plaintiff.

    Jackson Lewis LLP
        (by David J. Kerman, Esq.)
        75 Park Plaza, Boston, MA 02116,
        for the Defendant.

                    *  *  *  *

1   and the name of the person that I called in was

2   Stephen D'Orio.

3       Q.    Is this a company that Kindred uses for

4   CORI checks?

5       A.    Correct.

6       Q.    Did Mr. Reis object to you calling him in

7   to do CORI checks?

8       A.    I don't get your question.

9       Q.    You said that you called this company in,

10  NCPS, to do CORI checks?

11      A.    No.  I called them in to find out why the

12  building was so out of compliance, why we were not

13  complying.  I called them to find out if we were

14  paying for a service that we weren't getting.

15      Q.    What did you find out when you spoke to

16  them?

17      A.    I found out that we had to resubmit a whole

18  bunch of new employees and it was going to cost us

19  more money.

20      Q.    Is this because, to your understanding,

21  Lisa Akins hadn't submitted the information to them

22  in the first place, or did you figure out -- you

23  described her as being at fault?

24      A.    No, I didn't describe her as being at

1    fault.  I described that as being her

2    responsibility.  I would say that Reis was at fault.

3        Q.    Why do you say Reis was at fault?

4        A.    Because she was the administrator there for

5    the two weeks prior to me going in, and he knew what

6    mess he was faced with.

7        Q.    But you described only 50 out of 130

8    employees had been legally CORIed; is that correct?

9        A.    Correct.

10       Q.    So that means 80 employees had not been

11   legally CORIed?

12       A.    Correct.

13       Q.    You are not suggesting that Mr. Reis had

14   hired those 80 employees, are you?

15       A.    No.  But what I am suggesting is the system

16   wasn't in place to screen them appropriately.

17       Q.    He told you to fix it, correct?

18       A.    Correct.

19       Q.    And you did fix it, correct?

20       A.    Correct.

21       Q.    Did you have to spend extra money in order

22   to get this thing fixed?

23       A.    Yes.

24       Q.    Did he authorize the expenditure of the

144

1    in another building, not Embassy House.

2        Q.    Why do you say it reflects the hours that

3    they worked in another building?

4        A.    Because that's what the payroll benefits

5    coordinator told me.

6        Q.    How do you know that these staff people

7    weren't working in your facility?

8        A.    I know they weren't in my building.

9        Q.    How do you know that?

10       A.    Because they didn't attend my morning

11   meetings and they weren't in the rehab department,

12   they weren't in the building.

13       Q.    Were they ever in your building during the

14   time you were administrator?

15       A.    At some point in time they may have.

16       Q.    Let me ask you this:  You spoke to Theresa

17   Brooks about this.  Did you ever speak to Gilbert

18   Reis or anyone else in corporate about this?

19       A.    No.

20       Q.    Did you ever complain to anybody that there

21   was anything false or fraudulent going on with these

22   rehab people or rehab dollars being transferred to

23   your facility?

24       A.    No.

201

1    COMMONWEALTH OF MASSACHUSETTS)

2    SUFFOLK, SS.                    )

3        I, Daniel P. Wolfe, Registered Professional

4    Reporter and Notary Public in and for the

5    Commonwealth of Massachusetts, do hereby certify

6    that there came before me on the 31st day of March,

7    2004, at 10:15 a.m., the person hereinbefore named,

8    who was by me duly sworn to testify to the truth and

9    nothing but the truth of his knowledge touching and

10   concerning the matters in controversy in this cause;

11   that he was thereupon examined upon his oath, and

12   his examination reduced to typewriting under my

13   direction; and that the deposition is a true record

14   of the testimony given by the witness.

15       I further certify that I am neither attorney or

16   counsel for, nor related to or employed by, any

17   attorney or counsel employed by the parties hereto

18   or financially interested in the action.

19       In witness whereof, I have hereunto set my hand

20   and affixed my notarial seal this 6th day of April,

21   2004.

22                    _____

23                          Notary Public

24                    My commission expires  9/18/09

**DORIS O. WONG ASSOCIATES, INC.**
(617) 426-2432 ~ Fax (617) 482-7813

# EXHIBIT B

2-1

Volume II
Pages 2-1 to 2-236
Exhibits 5 to 32

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                        :
LARRY J. LeBLANC,           :
        Plaintiff,       :
                        :
     vs.                :  C.A. No.
                        :  04-CV-10193RCL
KINDRED NURSING CENTERS EAST,  :
LLC, d/b/a EMBASSY HOUSE,    :
        Defendant.      :
                        :
- - - - - - - - - - - - - - - - -x

       CONTINUED DEPOSITION OF LARRY J. LeBLANC, a
witness called on behalf of the Defendant, taken
pursuant to the Federal Rules of Civil Procedure,
before Ken A. DiFraia, Registered Professional
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Offices of
Jackson Lewis LLP, 75 Park Plaza, Boston,
Massachusetts, on Wednesday, June 16, 2004,
commencing at 10:33 a.m.

PRESENT:

    Paul A. Manoff, Esq.
       47 Winter Street,
       Boston, MA 02108, for the Plaintiff.

    Jackson Lewis LLP
       (by David J. Kerman, Esq.)
       75 Park Plaza, Boston, MA 02116,
       for the Defendant.

* * * * *

2-16

```
 1        A.    No.

 2        Q.    Do you know what kinds of expenses and

 3   costs were kept on the computer?

 4        A.    Accounts payables, accounts receivables.

 5        Q.    Were there other expenses and costs that

 6   she kept?

 7        A.    Not that I know of.

 8        Q.    Did you have access to this computer to

 9   check on the information that she was keeping if you

10   chose to look at it?

11        A.    No.

12        Q.    You didn't have access?

13        A.    No.

14        Q.    Did you ever try to get access to that

15   information?

16        A.    No.

17        Q.    You trusted her to be doing it accurately?

18        A.    Yes.

19        Q.    To your knowledge, was this information

20   that she was keeping on the computer also something

21   that was sent to the corporate people at Kindred?

22        A.    Yes.

23        Q.    So they had access to the information that

24   she was keeping on the computer, correct?
```

1     A.    Yes.

2     Q.    You don't have any information or reason to

3  believe that any of the information that Heidi Mason

4  was keeping on the computer was inaccurate or

5  fraudulent or false, do you?

6     A.    No.

7     Q.    As administrator, did you have any

8  responsibility to ensure that the information that

9  Heidi Mason was keeping on the computer was

10  accurate?

11     A.    No.

12     Q.    You trusted her essentially?

13     A.    Yes.

14     Q.    Based on your experience with her, were you

15  confident that she was keeping accurate information

16  on the computer with regard to expenses, accounts

17  receivable and accounts payable?

18     A.    Yes.

19              (Document marked as LeBlanc

20              Exhibit 9 for identification)

21     Q.    I'm showing you what was marked as Exhibit

22  No. 9.  I'll also represent, if you want to see,

23  Mr. LeBlanc, that Exhibit 9 is also a copy of a

24  document that you previously produced to us in your

2-42

1    front page for the cost report verification section.

2    I need his original signature sent to me for our

3    cost report file."

4            Did the branch office manager, Heidi Mason,

5    ever discuss that issue with you?

6        A.    Not that I recall.

7                    (Document marked as LeBlanc

8                    Exhibit 13 for identification)

9        Q.    I'm showing you Exhibit 13.  It includes

10   two E-mails.  Take a moment to read those E-mails to

11   yourself, please.

12       A.    (Witness reviews document)  Okay.

13       Q.    Let me start again chronologically with the

14   second E-mail on Exhibit 13, which is from a Sue

15   Reidel sent March 18, 2003, and it says, "To Larry

16   LeBlanc."  Do you recall receiving this E-mail from

17   Sue Reidel?

18       A.    Vaguely.

19       Q.    Do you remember what department or area she

20   worked in?

21       A.    It says it right here, Corporate Director

22   of Reimbursement, Health Services Division.

23       Q.    Did you ever speak to Sue Reidel about

24   either this E-mail or the cost report verification

2-43

1    issue?

2        A.    I don't remember.

3        Q.    But you said you vaguely recall getting

4    this?

5        A.    That's correct.

6        Q.    The second paragraph of this March 18th

7    E-mail says, "We're not asking you to verify the

8    accuracy of the cost report itself, rather the

9    accuracy of the underlying data contained in your

10   facility general ledger census records, et cetera,

11   which support the data reported in the cost report

12   and any other documentation maintained in support of

13   the cost report filing, to the best of your

14   knowledge and belief."

15            Did you understand what that statement

16   meant?

17            MR. MANOFF:   Objection.

18       A.    Yes.

19       Q.    Did you have any problem as administrator

20   of the facility verifying the accuracy of the

21   underlying data contained in your facility's general

22   ledger and census records?

23            MR. MANOFF:   Objection.

24       Q.    You may answer.

2-46

1   you would not want to be responsible for verifying

2   the information that Heidi Mason was putting into

3   the computer regarding the general ledger and census

4   records, correct?

5        MR. MANOFF:  Objection.

6   A.   Correct.

7   Q.   Who, if anyone, Mr. LeBlanc, do you think

8   should be responsible for verifying the accuracy of

9   that information?

10       MR. MANOFF:  What information?

11       MR. KERMAN:  That Heidi Mason is putting in

12  the computer regarding the general ledger and census

13  records.

14       MR. MANOFF:  Objection.

15  Q.   You can answer.

16  A.   Her district supervisor.

17  Q.   But you were also her on-site supervisor,

18  correct?

19  A.   Yes.

20  Q.   You are saying then it should have been her

21  district supervisor as opposed to the administrator

22  of the facility that should have verified the

23  accuracy of the census information and general

24  ledger information that Heidi Mason was putting into

2-124

1    was currently located before the move?

2        A.    He may have, but the end result was the fax

3    machine was moved back to its original location.

4        Q.    Do you know why that happened, that it was

5    moved back?

6        A.    Because the nursing staff didn't have

7    access to a fax machine.

8        Q.    When it was in the social worker office,

9    you are saying they didn't have access to it?

10       A.    Right.  It was a problem.

11       Q.    There's a category here that says, "Open

12   Positions."  Also, the last sentence of that

13   category says, "Wage survey must be completed in the

14   next two weeks and proposal sent to Gilbert."  Do

15   you remember any discussion about that on June 3rd?

16       A.    Only that we had already done it.  It was

17   repetitious.

18       Q.    When had you done the wage survey?

19       A.    We had done one earlier on.  I'm not sure

20   exactly when.

21       Q.    Well, this is dated June 3rd.  Could you

22   give me an estimate as to when it was.

23       A.    It may have been done the beginning of the

24   year.  It may have been done in January.

2-125

1    Q.    Could it have been done in November or

2    December of 2002?

3    A.    It could have.

4    Q.    Was there discussion that someone wanted a

5    new survey done?

6    A.    Yes.  That was a repeat.

7    Q.    Did someone say they wanted a new survey

8    done?

9    A.    Not that I recall.

10    Q.    What was a repeat then?

11    A.    Well, we had initially done a wage survey,

12    and we had given whoever it was all the information

13    they needed.  The Mass. Extended Care Federation

14    also did a survey on employment trends.  All the

15    information was given to Reis.

16        I also gave him wage information from some

17    of our competitors.

18    Q.    You say, "all the information was given to

19    Reis."  When was it given to Reis?

20    A.    When we were addressing the entry level

21    issues that we had discussed before that was sent to

22    Donna Kelsey.

23    Q.    I thought you said that was before November

24    2002.

2-155

1     A.    It was my impression.

2     Q.    Why did you form that impression?

3     A.    Because there was no discussion, no

4 justification for it.

5     Q.    Did you ask to have a meeting with

6 Mr. Govoni to discuss the items that were on this

7 list?

8     A.    No, because they had already been

9 discussed.

10     Q.    What had already been discussed?

11     A.    The items on the list.

12     Q.    You said that you told him that you were

13 denying everything that was on the form?

14     A.    Yes.

15     Q.    Did you read the document in his presence

16 and then tell him that you were denying it?

17     A.    Yes.

18     Q.    What as best you recall did you actually

19 say to Mr. Govoni after you had a chance to read

20 what was on this document?

21     A.    That it was untrue, not founded.

22     Q.    Besides saying it was not founded, did you

23 elaborate or explain why?

24     A.    Not that I recall.

2-156

1    Q.   It was just a ten-second response then?

2    A.   That's all it was.

3    Q.   I want to go over a couple of items here.

4         On the first page in the first box where

5    there's typewritten comments, it says, "On 6/3/03

6    during meeting with District Director of Operations

7    and Area Administrator, the employee was requested

8    to complete a wage survey of competition in the

9    area.  He was directed to have this to the District

10   Director within two weeks.  Not completed as of

11   7/15/03."

12        Do you deny that you had not completed the

13   wage survey as of 7/15/03?

14   A.   Yes.

15   Q.   What is your basis for denying that it was

16   not completed?

17   A.   Because it had been.  We had already done

18   one before.

19   Q.   That was the one that was done in November

20   or December of 2002, correct?

21   A.   Right.  Nothing had changed.

22   Q.   You say "Nothing had changed," but

23   apparently Mr. Reis and Mr. Govoni wanted a new wage

24   survey done; isn't that true?

2-157

1          MR. MANOFF:  Objection.

2     Q.    You can answer.

3     A.    Yes.

4     Q.    They did want a new wage survey done; is

5   that correct?

6     A.    Yes.

7     Q.    You didn't do it because you thought it

8   would be a waste of time because they had not done

9   anything on the first wage survey six or seven

10  months earlier; is that correct?

11    A.    No.  This was discussed with the team.

12  They felt that it was a waste of our time.

13    Q.    Who felt that?

14    A.    The department heads, the team, nursing,

15  all those involved, that we had already gone through

16  this process, and it was a waste of time because no

17  action was taken.

18    Q.    But Mr. Govoni and Mr. Reis had indicated

19  that they wanted a new wage survey done, correct?

20  And then you discussed it with your team, and they

21  didn't want to do it?

22    A.    That's correct.

23    Q.    Who do you take your orders from, the team

24  or Mr. Govoni and Mr. Reis?

1        Q.    That's just speculation of what they talked

2    about in terms of the wage survey when they spoke to

3    her; is that correct?  You don't know for a fact

4    what they discussed with her?

5        A.    That's correct.

6        Q.    Then the second item on this memo says,

7    "During MOR's" -- first of all, what are MOR's?

8        A.    Monthly operational reviews.

9        Q.    Is that similar to the term before that

10    they used, the term "operations reviews" or "ops

11    review," or is that something different?

12        A.    It was different in its context, but it was

13    the same in a financial way, you know.

14        Q.    But this refers to "During MOR's with

15    District Director of Operations and Area

16    Administrator, the employee was requested to contact

17    sister facility's MMQ nurse for assistance auditing

18    charts.  This meeting was held the week of 6/9/03,

19    not completed as of 7/15/03."

20            You agree that you had not contacted the

21    MMQ nurse at the sister facility, correct?

22        A.    Yes.

23        Q.    The last item in the box says, "On June 17,

24    2003, employee did not report to scheduled

2-184

1  direct care to patients or residents of a nursing

2  home, a professional license?

3        A.    Yes.

4        Q.    What professional license do you have?

5        A.    I have a nursing home administrator's

6  license.

7        Q.    What type of patient care services does

8  that allow you to provide to residents?

9        A.    I'm not sure.

10       Q.    But you never provided any direct services

11  to the residents in terms of patient care or

12  anything like that?

13       A.    No.

14       Q.    Other than nursing home administrator, you

15  don't have any other professional healthcare

16  licenses, whether it be social worker, nursing

17  degrees?  Do you have any other professional

18  licenses?

19       A.    No.

20       Q.    Do you believe Kindred terminated your

21  employment because you objected to any unlawful

22  practices or objected to any unsafe patient care

23  practices?

24       A.    Yes.

2-186

1      Q.   Are there any other examples you can give

2   me where you believe that you were terminated

3   because you had objected to either unlawful activity

4   or activity that jeopardized patient care?

5      A.   The other unlawful act was to do

6   improvements on another property that wasn't ours.

7      Q.   Anything else?

8      A.   Not that I can think of.

9      Q.   Are you aware of any facts that in any way

10   connect the decision to terminate you in August of

11   2003 with the fact that you had raised the issue

12   about CORI's not being done, are you aware of any

13   facts connecting those two incidents?

14           MR. MANOFF:  Objection.

15      Q.   You can answer.

16      A.   I believe there was a connection.

17      Q.   Could you tell me if you have any facts to

18   support your belief that there was a connection

19   between your objecting about CORI's not being done

20   and the fact that you were terminated in August of

21   2003.

22           MR. MANOFF:  Objection.

23      Q.   You can answer.

24      A.   Did I object that the CORI's were not being

2-201

1      Q.    He also thought it was an unreasonable

2   idea, correct?

3      A.    Correct, without getting permission.

4      Q.    The conversation that you had with Mr. Reis

5   and Mr. Govoni where Mr. Reis was talking about

6   making improvements on this parking lot,

7   approximately when did that occur again?

8      A.    I think in July.

9      Q.    How long was the conversation about the

10  particular issue of repaving this lot?  How long did

11  that conversation go on for?

12     A.    We walked outside.  We were all together

13  outside in the parking lot for about ten minutes.

14     Q.    Did Mr. Reis ever speak to you about that

15  issue again besides the meeting that occurred while

16  you were outside in the parking lot?

17     A.    Not that I recall.

18     Q.    Did you complain about any other illegal

19  practices or unsafe patient practices besides what

20  you have identified that you believe contributed to

21  your termination from employment?

22     A.    That may have?

23     Q.    No, that you, in fact, believe contributed

24  to your termination.

2-202

1          MR. MANOFF:  Objection.

2      A.    Well, we took an office, the activities

3  office, and we turned it into a rehab room.  I

4  insisted that we get permission on that.  That was

5  refused.

6      Q.    Do you think the position you took on that

7  contributed to your termination from employment?

8      A.    Yes.

9      Q.    What leads you to have that belief?  What

10  facts lead you to have that belief?

11      A.    Because Reis had ordered me to do it.

12      Q.    Is it your testimony that any time you

13  disagree with a supervisor, that that would

14  contribute to your termination?

15          MR. MANOFF:  Objection.

16      A.    Yes.

17      Q.    Are there any other facts that you can

18  identify that lead you to believe that there was a

19  link between the position you took on that

20  activities office and the subsequent firing?

21      A.    No.

22      Q.    This activities office, this was turned

23  into rehab office space, correct?

24      A.    Yes.

2-236

1   COMMONWEALTH OF MASSACHUSETTS)

2   SUFFOLK, SS.                    )

3       I, Ken A. DiFraia, Registered Professional

4   Reporter and Notary Public in and for the

5   Commonwealth of Massachusetts, do hereby certify

6   that there came before me on the 16th day of June,

7   2004, at 10:33 a.m., the person hereinbefore named,

8   who was by me duly sworn to testify to the truth and

9   nothing but the truth of his knowledge touching and

10  concerning the matters in controversy in this cause;

11  that he was thereupon examined upon his oath, and

12  his examination reduced to typewriting under my

13  direction; and that the deposition is a true record

14  of the testimony given by the witness.

15      I further certify that I am neither attorney or

16  counsel for, nor related to or employed by, any

17  attorney or counsel employed by the parties hereto

18  or financially interested in the action.

19      In witness whereof, I have hereunto set my hand

20  and affixed my notarial seal this _6th_ day of July,

21  2004.

22              _Ken A. DiFraia_

23                  Notary Public

24          My commission expires 4/3/09



# EXHIBIT C

1



Volume 1
Pages 1-122
Exhibits:  See index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-CV-10193RCL

- -- - - - - - - - - - - - -

LARRY J. LEBLANC,                :
        Plaintiff      :
                           :
   v.                             :
                           :
KINDRED NURSING CENTERS          :
EAST, LLC, d/b/a EMBASSY         :
HOUSE,                           :
        Defendant      :

- - - - - - - - - - - - - - -

    DEPOSITION OF **GILBERT C. REIS,** taken
on behalf of the Plaintiff, pursuant to
the applicable provisions of the Federal
Rules of Civil Procedure, before Carol A.
Fierimonte, Certified Shorthand Reporter
and Notary Public within and for the
Commonwealth of Massachusetts, (#134693),
at the Law Office of Paul A. Manoff, 47
Winter Street, Boston, Massachusetts, on
Thursday, **August 5, 2004,** commencing at
10:25 a.m.

**SHEA COURT REPORTING SERVICES**
**(617) 227-3097**

1  many months you were going to be doing

2  this for?

3  A.  The goal, the goal was to fill the empty

4  beds.  And once we did that, then we would

5  convert the room back into a resident

6  room.

7  Q.  And if you never converted, if you never

8  filled the beds, then it was going to stay

9  as a gymnasium?

10  A.  It may have.  I don't know.

11  Q.  Okay.  So Mr. LeBlanc said we need state

12  approval for this?

13  A.  It was not necessary.

14  Q.  No.  But he said that?

15  A.  Yes.  There may have been that discussion.

16  Q.  What did you say to him?

17  A.  "It is not necessary."

18  Q.  Did you explain why it wasn't necessary?

19  A.  Again, this was a temporary situation.

20  Q.  Well, I am just interested now in what you

21  told him and what he told you.

22  A.  Yes.

23  Q.  He said we need state approval, you said

24  it is not necessary.  Did you explain to

COMMONWEALTH OF MASSACHUSETTS)
                             )    ss.
COUNTY OF NORFOLK            )


    I, Carol A. Fierimonte, a Notary
Public within and for the Commonwealth of
Massachusetts, duly commissioned,
qualified and authorized to administer
oaths and to take and certify depositions,
do hereby certify that heretofore, on the
date cited above, the witness personally
appeared before me at the above location
and testified in the above-captioned case;
that the said witness was by me duly sworn
to testify to the truth, the whole truth
and nothing but the truth; that thereupon
and while said witness was under oath, the
deposition was taken down by me in machine
shorthand at the time and place therein
named and was reduced to typewriting
thereafter.


    I further certify that the said
deposition constitutes a true record of
the testimony given by the said witness.


    I further certify that I am not
interested in the event of this action.


    IN WITNESS WHEREOF, I have hereunto
subscribed my hand this 19th day of
August, 2004.


             _____
             Notary Public in and for the
             Commonwealth of Massachusetts

             My Commission expires
             September 9, 2005